IRWIN B. SCHWABE COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT.

Docket Nos. 7526, 8585.  Promulgated April 21, 1949.

*Benjamin Mahler, Esq.*, for the petitioner.
*Thomas R. Wickersham, Esq.*, for the respondent.

## OPINION.

MURDOCK, *Judge*: The petitioner claims relief under section 722 (b) (4). It has been stipulated that this petitioner is entitled to use the excess profits credit based on income. The average of the normal earnings of such a taxpayer for a base period are compared with its earnings for the taxable year in determining its excess profits tax. This is accomplished through an excess profits credit. The issue in this case relates solely to the question of what amount should be regarded as normal average base period net income for the purpose of computing the excess profits credit based upon income. The actual earnings of the base period are used for that purpose, unless one of the relief provisions applies. Here one of the relief provisions has already been applied by the Commissioner. That is, the Commissioner has computed an excess profits credit under the growth formula to arrive at a credit substantially higher than that computed by the use of actual earnings during the base period. See section 713 (f) applicable to 1941 and section 742 (h) applicable to 1942 and 1943. The petitioner claims, however, that it is entitled to an even greater credit, computed under section 722 by the use of a constructive average base period net income to represent what it says should be regarded as its normal earnings for the base period.

The petitioner is a corporation which was organized on September 30, 1939. It took over on that date a business of selling play suits and work shirts which had previously been conducted by Irwin B. Schwabe, an individual, under the name of Irwin B. Schwabe Co. The

business did not include the manufacture of the play suits and work shirts being sold. The claims for relief filed by the petitioner relate only to that part of its business involving the sale of work shirts and, consequently, relief can not be based upon any other phases of its business. *Blum Folding Paper Box Co.*, 4 T. C. 795.

The base period for the purpose of section 722 began on October 1, 1936, and ended on September 30, 1940. The petitioner was in existence only during the last twelve months of that period. The parties have stipulated that the petitioner is an acquiring corporation and the business previously conducted by Schwabe as a sole proprietorship is a component corporation. See section 740 (a) (1) (D), (b) (5), and (h). Where, as here, the income of the sole proprietorship is included with the income of the taxpayer in computing the average base period net income, the taxpayer is to be treated as if the business of the sole proprietorship during that period had been a part of the business of the taxpayer. See sec. 722 (e) (2).

Section 722 allows relief where a taxpayer establishes that its excess profits tax without the relief, is excessive and discriminatory, and further establishes what would be a fair and just amount to represent normal earnings to be used as a constructive average base period net income. The tax is to be considered excessive and discriminatory where a taxpayer, like this one, entitled to use the excess profits credit based on income, shows that its average base period net income is an inadequate standard of normal earnings because the taxpayer changed the character of the business during the base period and the average base period net income does not reflect the normal operation of the business for the entire base period. The term "change in the character of the business" is defined to include, *inter alia*, a change in the operation or management of the business, a difference in the capacity for production or operation, and the acquisition before January 1, 1940, of a part of the assets of a competitor, resulting in the elimination or diminution of its competition. Section 722 (b) (4) provides that the change shall be deemed to have been made two years before it occurred if the business of the taxpayer had not reached the earning level by the end of the base period which it would have reached if the change had actually occurred two years earlier. The same subparagraph also refers to a change in the capacity for production or operation of the business consummated after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940. These are the provisions of section 722 (b) (4) under which this petitioner claims relief.

It was incumbent upon the petitioner to prove in this proceeding (1) that it changed the character of its business during the base period, (2) that its average base period net income is an inadequate standard of normal earnings because of that change, and (3) what

would be a fair and just amount to represent normal earnings for use in determining constructive average base period net income. Furthermore, the petitioner will not be entitled to relief under section 722 unless the constructive average base period net income which it establishes is greater than its average base period net income determined under the growth formula. That is, the relief which it has been granted already under the growth formula will stand until the petitioner shows that it is entitled to greater relief under section 722. *Homer Laughlin China Co.,* 7 T. C. 1325.

The petitioner contends that it changed the character of its business in several ways within the meaning of section 722 (b) (4). Its arguments are unsound in so far as they are based upon the assumption that either Irwin or I. B. S., separate corporations, engaged in the manufacture of shirts, were components of the petitioner or in any other way so identified with the petitioner, engaged only in sales, as to make their acts acts of the petitioner for present purposes. Irwin, rather than the petitioner, acquired Tupelo's plant at New Albany. The record does not show that Irwin became a part of the business of Irwin B. Schwabe Co. which the petitioner later took over, and even if Tupelo is to be regarded as a competitor, nevertheless, the petitioner has not shown that either it or its component acquired any of the assets of Tupelo. Likewise, any commitments of Schwabe or I. B. S. based upon manufacturing, all of which were made after the petitioner was organized and had taken over the sales business, can not be regarded as commitments of this petitioner. The petitioner bases some of its arguments upon the employment of Doron and his election to the office of vice president. There was no commitment to Doron which would aid the petitioner under section 722, and the evidence as a whole does not show that the petitioner is entitled to any relief or that it even qualifies for relief on the basis of its contentions based solely upon the employment of Doron.

The petitioner's argument that there was a difference in its capacity for operation before and after May 1938 is the strongest one advanced and the only one of its contentions to support a change in the character of its business which will be discussed in detail. The petitioner argues that Schwabe was restricted in two ways under his arrangement with Tupelo. One was that Tupelo was unwilling to use more than an undisclosed portion of its manufacturing capacity to manufacture shirts for Schwabe. The other was that Tupelo was dealing directly with some of the large mail order and chain store companies, and its understanding with Schwabe was that he would in no way compete in that field with Tupelo.

There is opinion testimony to the effect that Schwabe could have sold more work shirts during the first part of the base period had Tupelo been willing to manufacture more shirts for him. However,

there is little, if any, evidence in the record to support those opinions. The evidence does not show the exact arrangement in this respect between Tupelo and Schwabe. For example, it does not show how many shirts or what portion of the total capacity of Tupelo was available to Schwabe at any particular time during the base period, whether this maximum changed from time to time or remained the same, or the relation at any time during the base period between the number of shirts actually sold by Schwabe and the maximum that Tupelo would have manufactured for him. There is no evidence of any particular instance in which Schwabe could have sold additional shirts but was prevented from doing so because Tupelo would not manufacture them for him. His sales in 1937 were far below his sales in 1936. There is no evidence to show that the falling-off was due to a reduction in the allotment fixed by Tupelo. It may have been due instead to the fact that Schwabe was unable to sell in that year as many shirts as Tupelo would have manufactured for him. The increase in inventories is not adequately explained. Thus, it is not so clear that Schwabe's capacity to make sales during the first part of the base period was limited by his inability to have more shirts manufactured by Tupelo. Schwabe, as long as he was dependent upon Tupelo for the manufacture of his shirts, could not have gone into competition with Tupelo by endeavoring to make sales of his shirts to any of the large chain store or mail order houses, but just how much of a restriction upon him that was is not so clear.

However, he began to make sales to Penney during the last four months of 1938; his sales to Penney during the remainder of the base period were large; he began to make sales to Sears and to Kress during the third year of the base period; those sales increased during the fourth year of the base period and in that year sales were made to Montgomery Ward; and Doron, who like Schwabe was an experienced salesman, was employed by the petitioner, beginning in September 1939. The statute provides that "a difference in the capacity for * * * operation" shall be regarded as a change in the character of the business for the purpose of section 722 (b) (4). After May 1938 the entire production of Irwin was available to Schwabe and the petitioner, and they actually sold to the large chain store and mail order houses. Prior to that time some undisclosed portion of the capacity of Tupelo was available to Schwabe and he was not in position to solicit as customers any of the large chain store or mail order houses. Do these circumstances indicate a difference in the capacity for operation of this petitioner after May 1938 as compared to before May 1938 within the meaning of section 722 (b) (4)? It will be assumed for present purposes that they do.

The next question is whether the petitioner has shown that its average base period net income is an inadequate standard of normal

earnings because of a change such as the one described in the preceding paragraph. Closely related to that is the further question of what would be a fair and just amount to represent normal earnings for use in determining constructive average base period net income. The petitioner argues that the demand for work shirts exceeded its available supply at all times during the base period; this continued until the I. B. S. plant reached full production; the earning level of the business at the end of the base period was not as great as it would háve been had the change in the character of the business occurred two years earlier; twice the volume of shirts actually sold during the calendar year 1939 could have been sold had they been available; and, therefore, its average base period net income is an inadequate standard of normal earnings. It argues that the constructive average base period net income should be for the 1941 credit $72,986.42, and for the credits for the later years $87,349.45, compared with actual averages of $20,179.19 and $23,988.98, and averages under the growth formula of $33,858.40 and $41,067.27.[1]

The respondent has not argued the question of whether or not the petitioner changed the character of its business. His argument is that, even assuming a change, nevertheless, the petitioner has not shown that its average base period net income was an inadequate standard of normal earnings because of any change in the character of the business, or that a fair and just amount to represent its average normal earnings would exceed the average base period net income under the growth formula.

While it might seem reasonable to conclude that the sales of this business would have been greater in the first part of the base period if Schwabe had had all the shirts he could sell and had been free to sell them to anyone to whom he could make a sale, nevertheless, this record does not justify the conclusion that they would have been great enough to produce earnings in excess of the average allowed under the growth formula. Indications in the record that the sales made by Schwabe were limited by factors other than the number of shirts which Tupelo would have manufactured for him have already been mentioned. There is also some evidence tending to show that the sales during the latter part of the base period would not have been greater under any circumstances. There were then no restrictions upon the prospective customers to whom sales might be made, but the petitioner argues that its sales were still limited by lack of shirts, since the Irwin and I. B. S. plants were not able to manufacture as many shirts during

---

[1] The excess profits net income for the base period years for the purpose of the 1941 credit is somewhat less than the same figures for the purpose of the credits for the later years because of a change in the law. See section 711 (b) (1) (A), repealed with respect to taxable years beginning after December 31, 1940, by sections 202 (c) (2) and 205 of the Revenue Act of 1941.

the whole of that period as they could have manufactured had they gotten started 2 years earlier. That is true, of course, with regard to I. B. S., but it is not at all clear in the case of Irwin. The production record of Irwin indicates that it could have manufactured more work shirts during the latter part of the base period, but that it merely kept pace with the work shirt selling demands of the business of the petitioner. For example, it produced 23,203 dozen work shirts in the four weeks ended December 16, 1939, and it maintained an average production of over 19,000 dozen for the 5 periods of 4 weeks each preceding that date. Thereafter its production of work shirts declined, declined even more rapidly than its inventories increased. The increases in its inventories also indicate to some extent that lack of work shirts to sell was not responsible for the failure to earn greater profits during the base period. The petitioner argues that the inventories in the latter part of that period were merely sufficient to cover the undelivered Penney orders as of the end of each fiscal year. However, the inventory of finished and unfinished work shirts increased by about $36,000 during the last year of the base period, while the undelivered orders of Penney decreased by more than 3,000 dozen shirts. Furthermore, Penney supplied its own material for the shirts which it ordered and the cost of such material would hardly be reflected in the inventories of the petitioner. There are some other indications that the ability of the petitioner to sell work shirts during the latter part of the base period was not taxing the capacity of Irwin to make such shirts. For example, the work shirt capacity of Irwin was deliberately limited early in 1940 by a partial change-over to the manufacture of sport shirts. There may have been competition from the other Tupelo plants which were reopened about that time. Schwabe stated at the annual meeting of the directors of the petitioner on September 30, 1940, that "competition on work shirts became so keen that it was necessary for the corporation to manufacture [*sic*] additional items."

There is thus some reason to believe that the petitioner had fully realized by the end of 1939 the full benefit which it was going to derive from the termination of Tupelo and the new relationship with Irwin. The record does not show what portion of the petitioner's profit for any year was attributable to the work shirt business as distinguished from the play suit and later the sport shirt business. Even if it were apparent that the average actual earnings of the petitioner for the base period were an inadequate standard of normal earnings because of the difference in its business after May 1938 as compared to prior to May 1938, nevertheless, the petitioner would still lose because it has failed to show that a fair and just amount to represent normal earnings for use in determining constructive average base period net income

would exceed its average base period net income as determined under the growth formula. The petitioner is not entitled to the relief claimed under section 722, but must be content with the substantial benefits given it under the growth formula.

Reviewed by Special Division.