Reviewed by the Court.

*An order will issue in accordance herewith.*

WISCONSIN FARMER COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 9621.  Promulgated May 31, 1950.

*Denver A. Busby, C. P. A.*, for the petitioner.
*Richard L. Greene, Esq.*, for the respondent.

1026

OPINION.

ARUNDELL, *Judge*: In this proceeding, petitioner contests the respondent's disallowance of its claim for relief under section 722 (b) (4) and (b) (5) of the Internal Revenue Code.[5] Petitioner contends that the substitution of a different contract under which it sold accident policies to its subscribers from and after February 10, 1940, constituted a change in its business operations equivalent to a "change in the character of the business" under section 722 (b) (4), or was a

---

[5] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

\* \* \* \* \* \* \*

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

\* \* \* \* \* \* \*

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purpose of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services

factor which resulted in an inadequate standard of normal earnings during the base period within the meaning of section 722 (b) (5).

Section 722 (b) (4), in so far as material to the instant case, provides that the excess profits tax imposed shall be considered excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713 "if its average base period net income is an inadequate standard of normal earnings because * * * the taxpayer * * * during * * * the base period * * * changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business." It further provides that "the term 'change in the character of the business' includes a change in the operation * * * of the business * * *."

Initially, the parties raise the issue of whether the petitioner's business operations under the contract of January 23, 1940, consummated with Association were sufficiently different from its operations under its prior contract with the Hickey-Mitchell Co. to constitute a "change in the character of the business" within the meaning of section 722 (b) (4). The question of whether specific events were sufficient to bring about a change in the character of a business has been considered by this Court in such cases as *East Texas Motor Freight Lines*, 7 T. C. 579; *7-Up Fort Worth Co.*, 8 T. C. 52; *Lamar Creamery Co.*, 8 T. C. 928; *Irwin B. Schwabe Co.*, 12 T. C. 606; and *Stonhard Co.*, 13 T. C. 790. However, in none of these cases did we attempt to treat the question as a matter apart from the facts presented in each case. While the statute does not completely define what shall constitute a change in the character of a business, we are willing to accept the general principles outlined in Regulations 112, section 35.722–3 (d), where it is stated:

A change in the character of the business for the purposes of section 722 (b) (4) must be substantial in that the nature of the operations of the business affected by the change is regarded as being essentially different after the change from the nature of such operations prior to the change. No change which businesses in general are accustomed to make in the course of usual or routine opera-

---

furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished. Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940, or any acquisition before May 31, 1941, from a competitor engaged in the dissemination of information through the public press, of substantially all the assets of such competitor employed in such business with the result that competition between the taxpayer and the competitor existing before January 1, 1940, was eliminated, shall be deemed to be a change on December 31, 1939, in the charatcer of the business, or·

(5) of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.

tions shall be considered a change in the character of the business for the purposes of section 722 (b) (4). * * * A change in the character of the business, to be considered substantial, must be reflected in an increased level of earnings which is directly attributable to such change.

The nature or character of a taxpayer's business is at all times subject to many changes which do not necessarily serve to increase the earnings of the business but which in fact may actually result in substantial losses. However, the occurrence of a change in the character of a taxpayer's business for the purposes of securing relief under section 722 is important only if the change directly results in an increase of normal earnings which is not adequately reflected by its average base period net income computed under section 713. It is clear that the critical consideration in granting relief to the taxpayer in such cases as *East Texas Motor Freight Lines*, *7-Up Fort Worth Co.*, and *Lamar Creamery Co.*, *supra*, was the fact that the change was deemed sufficiently important in the taxpayer's business, as reflected by the increase in its earning capacity resulting from the change, to render its average base period net income inadequate as a standard of normal earnings for the entire base period.

In our opinion, we must regard as a change in the character or nature of a taxpayer's business for the purposes of section 722 (b) (4) any change in the operation of the business that has such a definite and far-reaching effect upon the taxpayer's earning capacity that its actual base period earnings no longer constitute an adequate standard of normal earnings and that results in the tax imposed on that basis being excessive and discriminatory. But this does not mean that a routine change or one which may reasonably be expected to come about in the course of normal business operations meets the test of the statute.

We regard the substitution of contracts whereby petitioner became a direct agent of Association instead of being a subagent for National Casualty as constituting a change in the character of its business within the meaning of the statute. The immediate effect of the change was to give the petitioner an added profit of 20 cents from each policy sold. Moreover, it permitted the petitioner to share in the ultimate profit realized by the insurance company, a feature which was not contained in petitioner's prior contract with National Casualty. The change was one which was certain to have a far-reaching effect upon petitioner's revenue from insurance sales and was not one which was ordinarily made from year to year in such contracts or could have reasonably been expected to come about in the normal course of business. The record shows that petitioner had dealt with the Hickey-Mitchell Co., as agent of National Casualty, for a 10-year period before obtaining its contract with Association whereby it became the latter's direct representative.

Although petitioner primarily operated a publishing business, there can be no doubt that it expected to make a profit from the policies sold, and the record supports petitioner's contention that its revenues from that source constituted a very substantial part of its total net income. From May 31, 1936, through December 31, 1939, petitioner realized an average annual gross income of approximately $23,000 from the sale of accident policies. Petitioner's books disclose an average annual expense directly attributable to such sales of approximately $6,000, and if a portion of the solicitor's total traveling expenses is allocated to the sale of accident policies, as we think it should be, an additional expense of $5,500 should be added. We have arrived at this figure by giving consideration to the number of subscriptions sold in relation to the number of policies written. The net income from the sale of insurance was therefore approximately $11,500, which amount is approximately 28 per cent of petitioner's actual average base period net income of $40,119.80 from all sources.

The increase in commission rates and the added right to share equally in the difference between the claim loss and 75 per cent of the total premiums collected provided for in the new contract was certain to result in an immediate and marked increase in the petitioner's net income, as the change in contracts did not involve any additional expenditures on the part of the petitioner. We are therefore convinced that as a result of this change, petitioner's actual average base period net income did not reflect the normal operation for the entire base period of the business and therefore was an inadequate standard within the meaning of the statute, as will more clearly appear from our discussion of petitioner's constructive average base period net income.

The petitioner's right to relief also depends upon its ability to establish under section 722 (a)[6] a fair and just amount representing normal earnings to be used as a constructive average base period net income.

---

[6] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayer generally occurring or existing after December 31, 1939, except that, in cases described in the last sentence of section 722 (b) (4) and in section 722 (c), regard shall be had to the change in the character of the business under section 722 (b) (4) or the nature of the taxpayer and the character of its business under section 722 (c) to the extent necessary to establish the normal earnings to be used as the constructive average base period net income.

It is respondent's position that, even if the substitution of contracts is regarded as a change in the character of the business under section 722 (b) (4), such change occurred after December 31, 1939, and therefore under section 722 (a) can not be considered in the determination of a constructive average base period net income.

The Commissioner's position is best illustrated by the following comments and the example contained in the Bulletin on Section 722, Part VIII, sec. C, pp. 148–149:

The statutory prohibition against regarding post-1939 events relates only to the *determination of the constructive average base period net income.* It does not affect the ascertainment of the event or factor under section 722 (b) which qualifies the taxpayer for a reconstruction of base period net income, and which may occur at any time during the base period. Consequently, any factors under section 722 (b) (1), (2), (3), (4), or (5), affecting any part of the base period after December 31, 1939, may be considered in determining whether the requirements of section 722 (b) have been met. In making the reconstruction, however, no regard may be had to the actual post-1939 experience of the taxpayer.

\* \* \* \* \* \* \*

Assume \* \* \* that a taxpayer with a base period ended November 30, 1940, bases its claim under section 722 (b) (4) on a change in capacity effected during July, 1940, to which it was not committed prior to January 1, 1940. The change in capacity, having occurred during the base period, is a factor which may be considered under section 722 (b) (4). But in the construction of normal earnings, no regard can be given to the change in capacity because it occurred after December 31, 1939. Consequently, no additional earnings resulting from the changed capacity can be included for any part of the base period. The taxpayer would, therefore, not satisfy the requirements of section 722 and its claim based upon the increased capacity could not be sustained. *It will thus be seen that any claim under section 722 (b) (4) based solely upon a change in the character of the business made after December 31, 1939, cannot be allowed.* It should be noted, however, that if the change resulted from a commitment made prior to January 1, 1940, the change is deemed to have been made on December 31, 1939, and would not be disqualified. [Italics supplied.]

The petitioner's eligibility for relief under section 722 (b) (4) is initially established by the fact that the change in the character of its business occurred on February 10, 1940, and within its base period which ended May 31, 1940. The statute, in using the term "base period," means the taxpayer's actual base period and not the four calendar years ended December 31, 1939. *East Texas Motor Freight Lines, supra.*

The statutory purpose of the restrictions incorporated in section 722 (a) was to exclude from consideration in the reconstruction of a taxpayer's average base period net income such events and conditions which were in fact subject to the influence of an abnormal war economy. Congress selected January 1, 1940, as the approximate date when such factors made themselves felt upon the economy. See S.

Rept. No. 1631, 77th Cong., 2d sess.; 1942–2 C. B. 504, 649; *Fezandie & Sperrle, Inc.*, 5 T. C. 1185. However, the record shows that petitioner made no changes in its sales organization or physical plant incident to the change in contracts from what it had been during the period from May 31, 1936, through February 9, 1940. The new accident policies were sold to the same subscribers in the same territory, by the same solicitors, and at the same price. The new policies carried the same protection and benefits as the old. There is no evidence that war conditions played any part in the petitioner's substitution of its insurance contracts or the increased commission rates and profit-sharing privileges it obtained as a result of the change.

Moreover, it was recognized by Congress that certain events would occur in the businesses of taxpayers after December 31, 1939, which could not be arbitrarily classified as arising solely from war conditions and that at least some part of the profits which resulted from such changes might well be regarded as "normal" and not taxable as "excess profits" within the intendment of the statute. Thus, Congress dealt specifically with the so-called "commitment" taxpayer in the last sentence of section 722 (b) (4) and the taxpayer who commenced business after December 31, 1939, in section 722 (c).

In writing the relief provisions of the excess profits statute, Congress gave a broad definition of the various conditions which would qualify a taxpayer for relief and an outline of the basic principles to be followed in the determination of such relief. But the very complexity of the problem necessitated that Congress leave a large measure of administrative discretion to those charged with carrying out its announced policy. It was recognized that the success or failure of the legislation to a considerable degree depended upon intelligent and sympathetic administration and that the statute should be interpreted to best effectuate the purposes of the legislation. H. Rept. No. 146, 77th Cong., 1st sess.; 1941 C. B. 550, 551.

We do not believe that Congress intended that the general provisions of section 722 (a) relating to the limitation of the use of post-1939 events in the determination of a constructive average base period net income were to be applied in such a manner as to repudiate completely the specific relief authorized by the several subsections of section 722 (b). Therefore, we have concluded that a change in the character of a taxpayer's business occurring during its base period but after December 31, 1939, may be regarded and related to the petitioner's financial experiences and earnings prior to January 1, 1940, in the determination of a constructive average base period net income under the provisions of section 722 (a) as has been done in the instant case.

In our determination of a constructive average base period net

income in the amount of $45,000, we have used as a basis petitioner's actual average base period net income as stipulated by the parties, making appropriate adjustments thereto to give effect to the 20-cent increase in commission rates provided for in the new insurance contract. Initially, we determined the petitioner's sales of policies for its entire base period by using figures indicative of petitioner's business during the period from May 31, 1936, to December 31, 1939, and by projecting such figures into 1940 to give recognition to the policies sold during that part of the petitioner's base period from January 1, 1940, through May 31, 1940. The increased commission rate of 20 cents was then applied to the number of policies so determined, resulting in an increase of approximately $5,300 in the petitioner's average annual net income. This figure was added to the actual average base period net income of $40,119.80, which latter figure we first adjusted to eliminate the income derived under the 20-cent increase in commissions for the period February 10, 1940, through May 31, 1940, which was reflected therein.

In determining a constructive average base period net income, we have refrained from any consideration of the profit-sharing provisions in the new contract, as there is no evidence in the present record from which we can properly evaluate the effect of these provisions without violating the limitations imposed by section 722 (a) respecting the use of post-1939 events and conditions. We can not accept the petitioner's proposal that we may properly recognize the petitioner's experiences under the profit-sharing plan from February 9, 1940, through December 31, 1942. We have herein determined that a change in the taxpayer's business occurring subsequent to December 31, 1939, but within its base period, may be recognized in so far as eligibility for relief is concerned and may be considered in respect to its effect on petitioner's normal earnings over its entire base period, but in so doing we have not violated the prohibition of section 722 (a) respecting the use of specific financial data such as sales, expenses, profits, etc., occurring after December 31, 1939.

It is our opinion that petitioner has established the right to use a constructive average base period net income in the amount of $45,000 in the recomputation of its excess profits tax liability for the fiscal year ended May 31, 1941, and in the determination of the refund in excess profits tax to which it is entitled under the provisions of section 722 (b) (4).

In view of our disposition of the issues raised under section 722 (b) (4), it is unnecessary for us to consider the petitioner's eligibility for relief under the provisions of section 722 (b) (5).

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*