OPINION. Raum, Judge: In 1932 petitioner was organized and commenced its business of operating a motion picture theatre, named Studio Theatre, at Phoenix, Arizona. Converted shortly theretofore from a one-story, store-type building on premises leased several months earlier by persons responsible for petitioner’s formation, Studio Theatre had been opened with a capacity of 337 seats. Petitioner’s business experience convinced its management within the next two years that this seating capacity was too small for operation at a satisfactory level of profit, and it was decided to increase the seating capacity of the theatre. It actually took a lease on adjacent property on December 31, 1935, in order to provide such additional seating capacity. The unexpected failure to obtain immediate possession from a sublessee at that property together with subsequent difficulties in securing the necessary financing prevented petitioner from carrying out its plan for some time. Finally, the theatre’s capacity was expanded in January 1942 to 518 seats. Petitioner claims that the enlargement of its theatre entities it to excess profits tax relief under section 722 of the Internal Revenue Code,[2] by reason of a change in “the character of the business” within subparagraph (b) (4). There appears to be no dispute that the substantial increase in seating capacity resulted in the requisite “difference in the capacity for production or operation” of the theatre, and therefore constituted a change in the character of petitioner’s business within the terms of (b) (4). It is quite clear that petitioner’s expansion in seating capacity qualified as such a change, and we have so found. Relief is generally available under (b) (4), however, only if the change occurred “either during or immediately prior to the base period.” But exception to this time limitation is made by the statute with respect to “Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940 * * The change here involved having been consummated in 1942, respondent urges that it is a change which fails to come within (b) (4) because it did not result from a course of action to which petitioner was committed prior to the specified date. We are unable to agree with this contention, and think that the expansion in seating capacity which took place in 1942 was the result of a “commitment” within the meaning of the statute. At the end of 1935, petitioner leased premises adjacent to the theatre with the purpose of acting on the desire of its management for an increase in seating capacity. Enlargement was to be achieved through expansion into a portion of a building located at these adjacent premises. This lease was for a term of 15 years, and obligated petitioner to pay a total rental of $135,000, and in addition petitioner agreed to pay the lessor-owner, Ackel Investment Company, a bonus of $7,500. The record shows, first, that, prior to the execution of this lease from Ackel, petitioner had assurance of a source for financing the expansion; and, secondly, that prior to execution of that lease, it had the promise of a tenant at the adjacent premises that the latter promptly thereafter would transfer its lease, which still had 2 years to run and which covered a portion of the premises needed for the contemplated enlargement, to petitioner for an agreed consideration. Petitioner therefore thought, and with reason, that it would be ready to proceed with the expansion in due course after the Ackel lease was executed. It was prevented from doing so, however; by a chain of developments which started with the unanticipated failure of the tenant to abide by its promise to transfer its lease to petitioner; instead, that tenant transferred its rights to another party, which then moved into the premises for the remaining 2 years of the transferor’s lease. The effect of this continued occupancy was that petitioner was unable to proceed with the enlargement and to take advantage of the offer it then had of financial assistance; and before the 2-year period of that occupancy had expired, that offer was withdrawn, and petitioner found itself at the end of that 2-year period without some other substitute which was immediately available on acceptable terms. Therefore, when petitioner found at the expiration of this 2-year period that the new occupant was interested in remaining for a further term, petitioner sublet the entire Ackel property for an additional 5 years beginning on February 1, 1938, but sooner terminable at petitioner’s option after 3 years from that date. Thereafter petitioner continued to try to find means with which to finance the expansion; and when it succeeded in doing so in 1941, it terminated this sublease, and proceeded to have the structural alterations made which were involved in achieving the contemplated expansion. Although the record is not without some suggestion that before the end of the base period petitioner, possibly because of the discouraging turn of events, at least suspended if not substantially abandoned its interest and intent in carrying through the expansion and put off the expansion for further examination at some indefinite time in the future, we think the facts and circumstances on the whole show rather a continuing, active interest in expansion and a continuing, persistent search for a way of financing it. True, there are facts which make suspect a claim that petitioner continued to be seriously “committed” to enlargement of the theatre, such as the long period of some six years between petitioner’s lease of the adjoining Ackel premises and the consummation of the enlargement, and petitioner’s sublease of the Ackel property for a minimum period of three years, beginning in the base period and extending beyond the end of the base period, during which petitioner disabled itself from making the enlargement. We find, however, that these facts are largely explained by the remainder of the record in a manner which does not negate the continued existence of a substantially unabated intent and effort to enlarge the theatre. The circumstances mentioned, rather than indicating an abandonment or suspension of prior intent, seem to us in the context of this record to reflect a subsisting attempt on petitioner’s part to cope with and resolve its difficulties in a way which would minimize potential losses and yet permit it to realize its objective of expansion. While petitioner’s failure to contract during the base period for the necessary alterations incident to expansion may be taken into account, it is not necessarily conclusive of the question of commitment. That is made clear by the history of the statute,[3] as is shown in the statement of the Senate Committee on Finance that “the commitments made need not take the form of legally binding contracts only.” S. Kept. No. 1631, 77th Cong., 2d Sess., pp. 201-202. See also E. P. C. 15,1947-1 C. B. 89, amending Bulletin on section 722, p. 58: “Progress to the point where the taxpayer could not withdraw without substantial detriment may be given substantial weight in determining whether or not taxpayer has committed itself * * *. On the other hand, commitment claims are not to be rejected solely on the ground that taxpayers which have otherwise complied with all of the essentials in commitment cases may, neverthless, be in a position where they might have withdrawn without substantial detriment prior to January 1,1940.” We think it incorrect to say on this record that petitioner could have withdrawn from enlargement of the theatre without incurring “substantial detriment”; the evidence does not show, for example, that it was able to recoup the bonus of $7,500 it paid on originally leasing the Ackel property, and it was a matter of speculation whether it would be able to recover the amount of rent for which it became liable for the remainder of the term of that lease. Even if we were to assume, however, that petitioner did not proceed during the base period to a point from which it could not withdraw without substantial detriment, we would still be satisfied, on all the facts and circumstances, that it had adopted a course of action within the statute which resulted in the enlargement of the theatre. If petitioner failed to proceed beyond such a point, it was due to the difficulties which it encountered without fault or design on its part, and failure to progress further under those circumstances was not evidence of a change in its plans. The record as a whole shows in our opinion that petitioner made “changes in position unequivocally establishing the intent to make the changes [in capacity for production or operation],” and that is enough to establish the “commitment” required by the statute. S. Eept. No. 1631, 77th Cong., 2d Sess., p. 202; see also Treasury Regulations 112, sec. 35.722-3 (d). The mere existence of a change in the character of the business within (b) (4) is not enough, however, to entitle petitioner to relief under section 722. Petitioner must also prove that, because of such change, its actual average base period net income does not reflect the normal operation during the base period of the business as changed, and it must also establish a fair and just amount representing normal base period earnings for the changed business. Respondent contends that petitioner has failed to prove compliance with these additional requirements, and that in any event it therefore must be denied relief. Respondent points out that the average base period net income of $4,422.17 used by petitioner (computed by use of the section 713 (f) growth formula) was about twice as great as the average of its excess profits net income for the base period years, which amounted only to $2,179.17; and respondent contends that in such circumstances petitioner must prove, if it is to get any relief, that it is entitled to a constructive average base period net income large enough to produce a credit in excess of the credit computed under the growth formula. Irwin B. Schwabe Co., 12 T. C. 606, 613-614. While petitioner’s proof is not as complete as might be desired, we are convinced on the record that its average base period net income even under the growth formula does not reflect the normal base period earnings of Studio Theatre enlarged to a capacity of 518 seats, and we are satisfied on all the evidence that, because of the expansion in seating capacity, petitioner is entitled to a constructive average base period net income which is $1500 more than its average base period net income of $4,422.17 under the growth formula. Expansion in the theatre’s seating capacity could have no effect in increasing petitioner’s base period income unless it would have had customers for those additional seats. If seating capacity was not a factor which limited petitioner’s base period earnings, then obviously it cannot be said that it would have enjoyed greater earnings with greater capacity. Indeed, to the extent that additional capacity would have imposed higher expenses without bringing a comparable increase in customers and revenues, petitioner’s net base period earnings would have declined rather than increased. It was therefore incumbent on petitioner to show that it lost customers because of insufficient seating capacity during base period years, and to prove the extent to which its net income would have increased, alter allowance for increased expenses which would have been incurred, if its theatre during the base period had 518 rather than 337 seats. Cf. Green Spring Dairy, Inc., 18 T. C. 217, 237-240. The record shows that during the base years Studio Theatre had periods of “peak attendance,” which recurred on certain days of the week and at certain times of the day, and that during such periods there was a convergence of customers seeking admission to the the-atre. It further appears in the record that at such times queues of waiting customers outside the theatre were not uncommon, due to the limited seating capacity of the theatre, and that not infrequently it happened, in such circumstances, that some persons would not wait long enough to be seated and others, seeing a line for admission to the theatre, would not wait at all. Such persons were lost as customers because the seating capacity was not larger during base period years. It may well have been, as respondent emphasizes, that on many such days the theatre had not reached its “saturation point,” in the sense that the aggregate number of persons admitted for all the performances during the day was less than the maximum number of persons who could have been accommodated throughout the entire day even by a theatre with 337 seats. Petitioner nevertheless could lose customers on such days because of the irregular and inconstant flow of customers; on the same day there might be times of surplus seating capacity and times of insufficient seating capacity. We are satisfied that there were concentrations of customers during these times of “peak demand” which the 337-seat capacity could not absorb, resulting in a loss of revenue which could have been avoided had a larger seating capacity been available. The proof leaves us somewhat in doubt as to the numbers of customers and the amounts of revenue thus lost. We think petitioner has failed to establish that it could have filled substantially all 518 seats with any appreciable regularity if they had existed during the base period years. The proof is also somewhat unsatisfactory as to the extent to which petitioner’s expenses would have risen as a result of these additional seats. While we believe from the record that they would have been somewhat less than the resulting increase in revenues, we are not satisfied that they would have been as insignificant as petitioner contends. Such expenses as salaries and compensation and the cost of utilities would have remained substantially the same or would have risen only a little. On the other hand, there can be little doubt that there would have been a substantial increase in depreciation deductions, resulting from the alterations and equipment necessary to make the enlargement. Taking into account all of the facts and circumstances relating to the effect of the expanded seating capacity on petitioner’s revenues from admissions and on its expenses of operation, and considering the record as a whole, we find the evidence to establish that petitioner’s average base period net income of $4,422.17, as determined under the growth formula, does not reflect the normal earnings of Studio Theatre with a capacity of 518 seats; and that, because of the increase in seating capacity, petitioner is entitled to a constructive average base period net income which is $1,500 more than the foregoing actual average base period net income of $4,422.17. Petitioner claims that the “changes” made in the theatre in 1942 entitled it to relief because of the impact on its earnings, not only of. a rise in income from admissions to the theatre, but also of an alleged increase in its sales of certain confectionary items such as ■candy and popcorn. Petitioner began to sell such items during the base period, through vending machines placed in the theatre lobby by an operator which paid petitioner a commission. In 1941, this arrangement was discontinued, and petitioner installed its own candy “counter” in the lobby in place of those vending machines. In 1942, when the seating capacity of the theatre was increased, the space in the lobby was enlarged by moving forward the doors behind the box-office at the entrance to the theatre, and a second candy “counter” was also installed outside those doors astride the theatre entrance. While the testimony in this connection is somewhat confusing, that is our understanding from the record of the sequence and nature of events relating to petitioner’s sale of candy and popcorn. The claim petitioner urges in these circumstances is rather uncertain. While petitioner stated in the claim it filed with respondent that it started to sell such items during 1938, petitioner does not seem to rely for relief on the fact of commencement of such sales during the base period. If it means to press a claim based on that fact, it must be unsuccessful if only for failure of proof that its normal earnings from those items, under the arrangement which existed during the base period for their sale, were not adequately reflected in the higher average base period net income which resulted from use of the growth formula of section 713 (f). Cf. Irwin B. Schwabe Co., 12 T. C. 606. If petitioner’s claim for relief depends on the installation of its own candy counter in 1941, we are unable to find the necessary “commitment” by petitioner to that .development prior to January 1, 1940. The only “commitment” we have been able to find on petitioner’s j>art relates to expansion in the seating capacity of the theatre; that took place in 1942 and, on the evidence, has not been shown to have had any connection with the installation of the candy “counter” more than a year earlier. The claim petitioner makes with respect to its sales of candy and popcorn seems to be based rather on the alterations petitioner made in enlarging the theatre in 1942, and, while not articulated too well, seems to rest on the dual assertion that the new “outside-counter” would contribute substantially to such sales by reaching persons outside the theatre, and that the old “inside-counter” would add to sales for the reason that enlargement of the lobby made the latter “counter” more readily accessible to patrons already admitted tp the theatre. We are unable to find on the record, however, that these’“changes” in 1942 relating to sales of candy and popcorn were the result of a course of action to which petitioner was committed prior to January 1,1940. Moreover, we are unable to find that the “changes” made in 1942 with respect to sales of candy and popcorn worked a change in the character of petitioner’s business within (b) (4). Those “changes” were not of sufficient scope or importance, so far as petitioner’s operations were concerned, to qualify as a change in the character of its business. While commencement of the sale of candy and popcorn in a chain of more than fifteen theatres owned by a taxpayer may be of sufficient business importance to it to qualify as a change in the character of its business (cf. Jefferson Amusement Co., 18 T. C. 44), it does not follow that petitioner’s addition of a second “counter” in a single theatre, in which such items were already being sold, is of comparable consequence to warrant similar treatment. Even less significant for petitioner, on the evidence before us, was the action taken in 1942 with respect to the “indoor-counter.” The record in this case leaves us with no doubt whatever that under the statute there was no substantial difference made in petitioner’s capacity for production or operation and no change in the character of its business in 1942 in connection with its sales of candy and popcorn. Cf. Treasury Regulations 112, sec. 35.722-3 (d); Farmers Creamery Co. of Fredericksburg, Va., 18 T. C. 241, 250-254; Clermont Groves, Inc., 17 T. C. 1616, 1621-1622; Wisconsin Farmer Co., 14 T. C. 1021, 1028. Respondent asserts that petitioner derived abnormal income during the base period as a result of its connection with Paramount Pictures, Incorporated, which controlled a 50 per cent stock interest in petitioner, and that a reconstruction under section 722 must be adjusted to exclude such income. The record is insufficient to establish, however, that “abnormal income” was in fact realized by petitioner because of that relationship or, if it was, the amount thereof, and there is consequently no occasion to pass on the matter. Reviewed by the Special Division. Decision will be entered under Rule 50. Sec. 722. GENERAL RELIEF — CONSTRÜCTIVE AVERAGE BASE PERIOD NET INCOME. (a) General Rule. — In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except that in the cases described in the last sentence of section 722 (b) (4) and in section 722 (c), regard shall be had to the change in the character of the business under section 722 (b) (4) or the nature of the taxpayer and the character of its business under section 722 (c) to the extent necessary to establish the normal earnings to be used as the constructive average base period net income. (b) Taxpayers using Average Earnings Method. — The tax computed under this sub-chapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because — ■ ******* (4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term “change in the character of the business” includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, * * * Any change in the capacity for production "or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940, * * * shall be deemed to be a change on December 31, 1939, in the character of the business. [[Image here]] The “commitment” provision of (b) (4) was added to section 722 by the Revenue Act of 1942, section 222 (a). As that provision was introduced by the Committee on Ways and Means of the House, it required the post-1939 change in capacity for production or operation to be a result of “commitments made prior to January 1, 1940, binding the taxpayer to make the change * * (Emphasis added.) H. R. 7378, 77th Cong., 2d Sess.; see also H. Rept. No. 2333, 77th Cong., 2d Sess., p. 146. The quoted language was deleted in the Senate and in its place there was put the wording ultimately adopted as law, namely, “a course of action to which the taxpayer was committed prior to January 1, 1940.” In explaining the purpose motivating this amendment, the Senate Committee on Finance stated that “Your committee 1ms made a clarifying amendment to this provision to make it manifest that the commitments made need not take the form of legally binding contracts only. * * * A course of action to which the taxpayer was committed may be evidenced by a contract, the expenditure of money in the commencement of the desired changes, or other changes in position unequivocally establishing the intent to make the changes.” (Emphasis added.) S. Rept. No. 1631, 77th Cong., 2d Sess., pp. 201-202.