WENTWORTH MILITARY, SCIENTIFIC AND LITERARY EDUCATIONAL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 29701, 31608. Filed June 30, 1954.

*Elmer B. Hodges, Esq.*, for the petitioner.
*David Karsted, Esq.*, for the respondent.

OPINION.

LeMire, *Judge:* The question presented is whether the petitioner is entitled to any relief from excess profits taxes for the fiscal years ended June 30, 1943, to June 30, 1946, inclusive, under the provisions of section 722 of the Internal Revenue Code.

We are convinced that the record establishes that the petitioner changed the character of its business during the base period years within the meaning of section 722 (a) and (b) (4) of the Code. The essential nature of the changes was the institution of new key managing personnel and the adoption of new basic management policies in the operation of the business.

The Wentworth Military Academy was founded in about 1880. In about 1909 it was incorporated and since that time has operated a school for boys, offering both high school and junior college courses. For many years Colonel Sandford Sellers, Sr., was the active head of

the academy and supervised its operation. After the end of World War I his three sons joined with him. One son soon left and the other two sons continued at the school. Sandford Sellers, Jr., and J. M. Sellers, together with their father, owned the stock of the corporation in equal portions. During the period 1922–1923 down to the commencement of the base period the academy suffered substantial and continuous losses annually, except in the school year 1925–1926, when the net profit was $606.57.

Because of the serious losses, J. M. proposed to his brother, Sandford, Jr., a purchase or sale of their respective interests, thus placing control in one of them. In 1934 J. M. acquired the interest of Sandford, Jr., who thereupon left the academy. By 1935 the petitioner's current obligations rose to between $35,000 and $40,000, its bank credit was cut off, and the problem as to whether the school could continue became acute. Upon acquiring the controlling interest J. M. became superintendent and turned over the business management to L. B. Wikoff, who had been associated with the school in various capacities since 1915. Wikoff took immediate steps to endeavor to rehabilitate the financial condition of the academy. He called into conference leading business men of the community and some creditors to discuss the situation and a committee was selected to undertake the sale of preferred stock. The committee persuaded certain creditors to accept preferred stock for their indebtedness and induced other men in Lexington to purchase preferred shares. In connection with the issuance of preferred stock it was agreed that three of the five directors were to be selected by the holders of the preferred stock. Two local bankers and the owner and publisher of a local newspaper were elected to the board of directors. The new board took a very active interest in the operation of the academy. It demanded the institution of a more scientific budget and discussed in detail the monthly financial statements to see that the budget estimates were adhered to.

In the latter part of 1935, Wikoff acquired the one-third interest in the common stock held by Colonel Sellers and was elected secretary and treasurer of the petitioner.

The new management changed its existing policy regarding the selection of its faculty members. Prior thereto the dean of the faculty had selected faculty members entirely on the basis of ability in the classroom and was unsympathetic with the type of instructor who was able to go on the road in the summer months and sell the school to prospective students. The new management unsuccessfully sought to have the dean alter his policies and replaced him. A change in the

type of faculty members was put in effect and teachers were selected with emphasis placed on practical value rather than scholastic ability.

The prior policy of the academy was to have the military man serve as commandant, with a result that there were frequent changes in that position. As the commandant was in charge of discipline it was felt that more permanency would improve morale and a new commandant was employed who has been permanent in that position.

Other changes inaugurated by the new management, although of lesser importance perhaps, were the adoption of a new uniform of brighter hue, the employment of a hostess who conducted classes in etiquette and arranged for parties and other entertainment, the institution of a hobby period, and the placing of more emphasis on the social interests of the student body. While all of these changes were not new in the sense that they were nonexistent under the old management, it was felt that the changes would make for a more pleasant student life, improve morale, and stimulate recruiting. While these last mentioned changes are not in themselves of too much significance, we think that in viewing the whole picture they are not to be ignored, although their ultimate effect on increased student enrollment is difficult to appraise.

The facts that the petitioner for a dozen years or more prior to 1935 had suffered continuous net losses and that during its base period the student enrollment and net income steadily increased persuade us to believe that the ensuing improvement in the petitioner's business stemmed from the change in its management and policies within its base period and qualifies it for relief within the purview of section 722 (b) (4) of the Code.

Notwithstanding the establishment of a qualifying factor, the petitioner has the burden of proving that its average base period net income is an inadequate standard of normal earnings because of such factor and also what would be a fair and just amount representing normal earnings. Sec. 722 (a), I. R. C.; *Green Spring Dairy, Inc.*, 18 T. C. 217; *Irwin B. Schwabe Co.*, 12 T. C. 606; *Powell-Hackney Grocery Co.*, 17 T. C. 1484.

The petitioner contends that due to the character of its business the improvements in earnings would be reflected only after a considerable time lag, and that by the end of the base period it did not reach the level of normal earnings it would have reached if the change in the character of its business had been made two years before.

Petitioner claims a constructive average base period net income for the taxable years in question in the amount of $53,098.58. The normal

net income for the base period without the benefit of section 722 is $10,762.86, and computed under the growth formula is $23,556.19.

The petitioner's reconstruction of its base period net income is not acceptable. It has erroneously applied the 2-year push-back rule. The purpose of the 2-year push-back rule is to establish a figure which is assumed to be the maximum amount which would have been earned in its last base period year if it had made the change 2 years before it did. Such assumed figure is then used as a point of departure in reconstructing the average base period net income, using appropriate indices. *Suburban Transportation System*, 14 T. C. 823; *Del Mar Turf Club*, 16 T. C. 749, 766. Furthermore, the petitioner bases its computation on data subsequent to January 1, 1940, although it makes no claim of any commitment in its base period.

The respondent contends that the petitioner does not qualify for relief and, furthermore, that the petitioner has not shown that a fair amount representing normal earnings would be in excess of its average base period net income computed under the growth formula.

On the basis of this record, we think the evidence is insufficient to show that a fair and just amount to represent petitioner's normal earnings would exceed its average base period net income as computed under section 713 (f) of the Internal Revenue Code and allowed by the respondent under the growth formula.

Therefore, we hold that petitioner is not entitled to any relief under section 722 of the Code.

Reviewed by the Special Division.

*Decisions will be entered for the respondent.*