FARMERS CREAMERY COMPANY OF FREDERICKSBURG, VIRGINIA, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 21672. Promulgated May 9, 1952.

*Wm. K. Goolrick, Esq.*, and *R. Carter Scott, Jr., Esq.*, for the petitioner.

*Arthur N. Mindling, Esq.*, and *William T. Holloran, Esq.*, for the respondent.

242

250

OPINION.

Raum, *Judge:* Applications for excess profits tax relief under section 722 of the Internal Revenue Code,[6] based on a "push-back" claim

[6] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except that in the cases described in the last sentence of section 722 (b) (4), and in section 722 (c), regard shall be had to the change in the character of the business under section 722 (b) (4) or the nature of the taxpayer and the character of its business under section 722 (c) to the extent necessary to establish the normal earnings to be used as the constructive average base period net income.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

* * * * * * *

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period

within subsection (b) (4) thereof, were filed by petitioner for the calendar years 1942 through 1945. Respondent denied these applications, and, on the record before us, we think his determination must be sustained, not only because petitioner has failed to prove a change in the character of its business within (b) (4), but also because it has not shown that its excess profits tax is excessive and discriminatory or that it is entitled to excess profits credits which are greater than those in fact used by it.

Petitioner was in the dairy business at Fredericksburg, Virginia, processing milk and manufacturing a variety of dairy products which it sold at retail and wholesale. Prior to 1938, petitioner's plant and office were located in the same building, to which we refer as the "old building." There it carried on both its manufacturing operations and its office work, and that building was also used for some storage purposes. In 1938 it completed construction of two additional buildings, a warehouse and an office building. Petitioner asserts that at about the same time it rearranged machinery and equipment in the old building; and in 1939 it bought additional machinery and equipment for the plant in the old building.

Petitioner contends that the two new buildings and the additions to and rearrangement of its machinery and equipment worked a change in the character of its business, in that its capacity for production was "enormously" expanded, and that it therefore qualifies for relief under (b) (4). Petitioner asserts that, in performing its office work at the old building and in using it for storage, there resulted a shortage of space for its manufacturing activities,[7] and that shortage is alleged to have been serious enough to have limited its productive capacity. The new buildings are asserted to have made possible a release of space in the old building, sufficient to permit an expansion and rearrangement in machinery and equipment to an extent which materially raised petitioner's productive capacity.

Examination of the "changes" made, and of the circumstances preceding and following them, compels us to conclude that they were not great enough to create a change in the character of the business within the meaning of (b) (4). After the warehouse was constructed,

---

net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made a change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, * * *.

[7] Petitioner does not claim, and it has made no attempt in this proceeding to prove, that it experienced a shortage in storage space which precluded it from keeping materials and supplies it needed in its manufacturing operations.

there were stored in it such supplies as cartons, boxes, sugar, and ice cream cones, and possibly some powdered milk. The warehouse was not equipped for the storage of fluid milk or most of petitioner's milk products, and the evidence fails to show that the limited purpose fulfilled by the warehouse could not have been satisfied at the old building without substantial adverse effect on petitioner's production. Petitioner has not established the extent of its storage facilities prior to erection of the warehouse, and it is not clear that the necessary storage space was not available either at the old building or elsewhere on petitioner's premises. While the warehouse may have relieved congestion at the old plant, we have before us nothing to show that such congestion was a limiting factor in relation to petitioner's production.

Similarly, although the office work at the old building may have made some inconvenient inroads on available space, we cannot say that it was in fact a limiting factor with respect to petitioner's productive capacity. Moreover, the newly constructed office building is deceptive as a measure of the space required for that work and the degree to which it may have interfered with petitioner's manufacturing operations. Although the office building had two stories, one of these was not used by petitioner at all but was rented out, and only a portion of the other story was used for its office work. In the past petitioner, as part of its normal operation, had added to or altered the old building in response to its needs, and if, instead of erecting an office building much too large for its requirements, it had simply made an addition to the old building adequate to accommodate its office operations, it could hardly be said that such an addition would have transformed the character of petitioner's business.

Besides the two buildings, petitioner relies on a "rearrangement" and an increase in its machinery and equipment. The evidence fails to disclose what this "rearrangement" was, and we are unable to tell what was rearranged or how it was done. There is here a failure of proof. To the extent that an inference can be drawn from the "changes" that are claimed to have made the "rearrangement" possible, we are unable to say that either storage or office work at the old building had been a serious obstacle to earlier rearrangement of the machinery and equipment, and we are not convinced that any substantial rearrangement took place merely as a result of the construction of the new buildings.

So far as the purchase of new machinery in 1939 is concerned, the record fails to establish that the character of petitioner's business changed on that account. Here too the proof was incomplete. While the record identifies the machinery acquired in 1939, there is no concrete evidence as to the contribution to petitioner's productive capac-

ity which could be expected or actually was achieved as a result of these purchases. Petitioner, as part of its regular policy and normal practice, had made purchases of machinery and equipment during the course of many years prior to 1939, just as it had also made building additions and improvements; and while the amounts spent varied from year to year, the expenditures in 1939 for machinery and equipment by comparison were not so great or so distinctive in dollar amount as to show a change in the character of the business. In 1939 petitioner spent $10,297.09 on such additions; in 1924, 1928, 1929, 1930, 1931, 1932, and 1936 it spent respectively $10,011.04, $7,400.49, $8,727.42, $9,252.44, $8,378.74, $8,156.33, and $11,071.77. Petitioner has failed to show, furthermore, that there was any essential qualitative difference between these earlier purchases and the ones made in 1939. Other than identification of a purchase of a boiler and stoker for $6,000 in 1936, there is a paucity of proof as to the nature of the machinery and equipment bought in the years prior to 1939, or that many of those prior purchases were not for additions to petitioner's plant rather than in replacement of retired or withdrawn machinery and equipment. On the record as a whole, we are unable to say that the machinery and equipment purchases on which petitioner relies created a change in the character of its business.

Petitioner insists that the combined effect of all these "changes" was a substantial increase in the productive capacity of its plant. Although we have discussed the pertinent "changes" individually, we believe that taken together their effect on petitioner's productive capacity was not significantly greater. We have been unable to find that those "changes" either separately or in combination were great enough to create an appreciable difference in petitioner's productive capacity. And aside from any inferences we may draw from the "changes" themselves, little remains in the record as a possible source of support for petitioner's claim. It introduced no evidence whatever in quantitative terms, based on some acceptable standard of measurement, as to the productive capacity of the plant before and after the "changes" were made, and it has failed to show in this manner that actually its productive capacity was affected to a substantial extent. Such evidence can reasonably be assumed to have been available to petitioner, and the omission in its proof in this regard may properly be taken to signify a lack of merit in its position. Cf. *Wichita Terminal Elevator Co.*, 6 T. C. 1158, 1165, affd. (C. A. 10) 162 F. 2d 513. It offered only the general testimony of two witnesses associated with it, who could hardly be said to have been disinterested, and who merely asserted in general terms that a state of congestion in the old building interfered with production and that the "changes" brought about a substantial increase in petitioner's productive capac-

ity. Those "changes," one of them added, "permitted, I would say, to double the capacity with the same personnel, permitted us to double it," without stating what the capacity may have been before or after it was "doubled." General opinions of this sort carry little weight in the absence of an adequate factual foundation. Cf. *Powell-Hackney Grocery Co.*, 17 T. C. 1484, 1488; *Pabst Air Conditioning Corporation*, 14 T. C. 427, 436–437.

Taking the events on which petitioner relies either singly or in the aggregate, we think it has failed to prove that they caused a substantial alteration in the character of its business. It certainly cannot be said on this record that "the nature of the operations of the business affected by the change is * * * essentially different after the change from the nature of such operations prior to the change." Regulations 112, sec. 35.722–3 (d). Cf. *Clermont Groves, Inc.*, 17 T. C. 1616, 1621–1622; *Newburgh Transfer, Inc.*, 17 T. C. 841, 852; *Wisconsin Farmer Co.*, 14 T. C. 1021, 1028. Petitioner has not shown that it comes within (b) (4) or any of the other categories described in section 722 (b), and it must be held ineligible for the relief it seeks.

Moreover, even if we were to agree that petitioner changed the character of its business through an increase in productive capacity, we would feel constrained to approve respondent's determination. More than just a change in the character of a business must be shown in order to become entitled to relief under section 722. Petitioner must also show that "because" of such qualifying change its average base period net income is an inadequate standard of normal earnings, and that it is entitled to excess profits tax credits, based on a reconstruction of its base period earnings, which are larger than the credits it used. And in order to receive the benefit of the 2-year "push-back" of (b) (4), it must show that the business did not reach by the end of the base period the earning level which it would have reached if the change had been made 2 years before it actually was made. We think that the evidence is insufficient to establish compliance with these requirements.

Petitioner contends that insufficient productive capacity during the base period, prior to the "changes" of 1938 and 1939, caused it to lose sales which it otherwise was able to make, and therefore reduced its earnings during that portion of the base period. As to the remainder of the base period, with respect to which no complaint is made about productive capacity, petitioner contends that some time was required before it fully could realize the beneficial effect of the "changes," and that their impact on its earnings had not been completely felt by the end of the base period. As a result, petitioner asserts, its level of earnings by the end of the base period would have

been higher if the "changes" had been made 2 years earlier, and that it is therefore entitled to a "push-back" under (b) (4). Its claim to relief thus rests on a claimed increase in sales caused by an alleged increase in productive capacity; increased sales would provide increased revenues and, petitioner also asserts, would make possible lower unit costs of processing and delivery.

The record is wholly inadequate, however, to show that during any of the base period years petitioner's productive capacity was a factor which to any extent limited its sales. There is no evidence at all as to customers whose purchases may have been lost because of insufficient productive capacity, or of the amounts of the sales lost for this reason. In support of its claim that sales were lost through lack of productive capacity, petitioner introduced in evidence only general testimony by the two interested witnesses who also testified about the "changes" which had been made. One of these witnesses was employed by petitioner to supervise installation and maintenance of its plant and equipment, and none of his duties were in any way concerned with petitioner's sales; he plainly was not qualified to express an informed opinion as to its sales. The other witness, an officer of petitioner, admitted that no retail sales had been lost because of lack of productive capacity, but asserted only that there had been a loss in wholesale customers and then only in the sale of condensed milk and ice cream mix. That witness, when asked, was unable to remember the names of any wholesale customers to whom petitioner sold ice cream mix in 1939 but not in prior years, and no facts were provided as to sales of either of these items claimed to have been lost. The testimony in this connection consisted only of general declarations unaccompanied by proof of relevant particulars, and, as we have noted, such general evidence is lacking in weight and persuasion. Cf. *Powell-Hackney Grocery Co.* and *Pabst Air Conditioning Corporation, supra.* For many years petitioner had adhered to a policy of periodically reviewing its needs in plant and equipment, and of taking steps to satisfy its requirements. We cannot find that it did not take timely action on this occasion. We think it clear that petitioner has failed to prove that it could have improved its earnings, either during the years of the base period or in the level it attained by the end of the base period, through an increase in its productive capacity prior to the time that the "changes" actually were made, or that its earnings suffered because the "changes" were not made sooner. Cf. *National Grinding Wheel Co.*, 8 T. C. 1278.

Although petitioner was entitled to compute its excess profits tax credits on the basis of earnings during the base period, it chose instead to compute its credits on the basis of its invested capital during the taxable years, because the invested capital method resulted in considerably higher credits. In such circumstances, to be entitled to

relief under section 722, the taxpayer must show that, based on constructive earnings during the base period, it is entitled to credits even higher than its invested capital credits. Cf. *Green Spring Dairy, Inc.*, 18 T. C. 217, 237; *Lamport Co.*, 17 T. C. 1079, 1084–1085; *General Metalware Co.*, 17 T. C. 286, 292; *Blaisdell Pencil Co.*, 16 T. C. 1469, 1484; *Stonhard Co.*, 13 T. C. 790, 799. Accordingly, even if its earnings had suffered to some extent because of insufficient productive capacity, there is no convincing showing on this record that the resulting loss was so great as to entitle petitioner to constructive earnings large enough to produce credits greater than its invested capital credits.

In accordance with our holding and in conformity with the stipulation of the parties,

> *Decision will be entered that petitioner is not entitled to relief under section 722 for the years in issue, and that there is a deficiency of $6,280.99 in petitioner's excess profits tax for 1945.*

Reviewed by the Special Division.