M. W. ZACK METAL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 32829.    Filed May 19, 1954.

*Victor R. Wolder, Esq.*, for the petitioner.
*John L. King, Esq.*, for the respondent.

#### OPINION.[1]

VAN FOSSAN, *Judge:* Petitioner brings this proceeding because of respondent's disallowance of its applications for relief for the calendar years 1942 through 1945 under section 722 (b) (4) and (5) of the Internal Revenue Code in the amounts of $11,391.99, $20,567.08, $46,010.81, and $37,329.46, respectively.

Findings of Fact substantially as proposed by the commissioner who heard the witnesses have been made and are filed as a part of the official record of the case. The ultimate finding of fact is made by the

---

[1] The hearing in this case was conducted by Commissioner Edward C. Radue.

Court. The following factual summary will suffice for the purposes of this opinion.

Petitioner is a Michigan corporation formed about October 9, 1930, which succeeded to the business formerly carried on by Morris W. Zack as a sole proprietorship. The petitioner corporation has at all times been engaged in buying, selling, and dealing in nonferrous metals, both scrap and new. Upon incorporation the shares of stock issued to Zack were assigned to Detroit Edison Company, hereinafter sometimes referred to as Edison, as collateral security for all present and future indebtedness, with the provision that upon feeling "insecure on account of such indebtedness" Edison had the full right and authority to sell the stock. Edison also had the right to vote the stock held as collateral. Edison placed three men on petitioner's board of directors, thereby giving Edison control of petitioner's policies. This arrangement continued until 1937 when Edison's indebtedness was paid. From the time of petitioner's incorporation until the date of the hearing in this case, Zack served as petitioner's president and general manager.

When petitioner was incorporated it took over the assets and assumed the liabilities which were held by Zack as a sole proprietor. Among the liabilities was a debt owing the Detroit Edison Company and its subsidiary, Edison Illuminating Company, in the amount of $47,172.07, and a debt owing the First National Bank of Detroit, in the amount of $25,454.47.

Edison had a study made of Zack's business activities from 1926 to 1931, inclusive. Its report showed that M. W. Zack's liabilities exceeded his assets by approximately $46,000 at the close of 1930. It was decided that his unfavorable business condition was the result of his becoming entangled in a number of real estate transactions and that this insolvency was due to the fact that M. W. Zack's income was being diverted into real estate transactions against which there were a number of outstanding mortgages and, consequently, the income from the metal dealings was being used to liquidate the mortgages against the real estate. Prior to petitioner's incorporation, Zack had lost large amounts of money in various real estate transactions.

When Zack and Edison considered incorporating the petitioner, no other creditors were called in for consultation. Edison underwrote the other creditors to the extent that it allowed them to be paid off before it received any cash.

On the commencement of its business, petitioner assumed the accounts payable by its predecessor to Edison of $47,172.07. As of October 15, 1930, petitioner's books showed an additional $4,500 owing to Edison Illuminating Company, which was canceled by a journal entry of December 22, 1932. Petitioner's books show that on De-

cember 1, 1932, it was indebted to Edison for accounts payable in the sum of $92,650.17; that on January 23, 1933, petitioner was indebted to Edison for loans payable of $15,000, by reason of 4 loans between December 16, 1932, and January 23, 1933. The $92,650.17 accounts payable included the $47,172.07 and sums due on account of metals purchased by petitioner from Edison after petitioner commenced business. The aggregate indebtedness of $107,650.17 eventually was paid, or forgiven, or discharged.

The indebtedness to the First National Bank of Detroit arose as a result of a payment by Roberts Brass Company for metal which it purchased from M. W. Zack with trade acceptances of the Detroit Smelting Company, which M. W. Zack endorsed and turned over to the bank. At one point the bank asked for additional security on these instruments and Lee Roberts, who owned Roberts Brass Company, pledged its stock as collateral. It was at this point that the Detroit banks closed and Roberts was left without sufficient funds to cover the instruments. M. W. Zack was then called upon to pay the amount due and owing on these instruments and an agreement was finally entered into with the bank.

This entire indebtedness to B. C. Schram, receiver, was paid off by April 1, 1938.

Prior to petitioner's incorporation, Edison bought from and sold to M. W. Zack large quantities of metal. After incorporation Edison continued this arrangement with the petitioner.

At no time between 1930 and 1937 did Edison charge petitioner interest on the $47,172.07 indebtedness.

By charging the petitioner no interest and not pressing it for immediate payment of the $47,172.07, Edison tried to assist petitioner in recovering its financial position. Edison was interested in M. W. Zack's business because he had been transacting business with it for a long time and Edison's officers wanted to recover the money loaned to the petitioner.

Edison was trying to assist petitioner to recover a solvent and sound financial position and petitioner was cooperating.

When Edison first placed its men on petitioner's board of directors in 1930, the arrangement was that Edison would not require the petitioner to pay the $47,172.07 owed to it by petitioner at any particular time but that any new credit extended by Edison to petitioner would be handled as a current obligation.

After the officials of Detroit Edison became directors of petitioner, Zack continued to conduct the business but the directors sought to protect Detroit Edison and supervised petitioner's operations and restrained it and Zack and any employee from highly speculative transactions, including taking a long or short position on the dealing in

metals for petitioner. The directors considered major transactions (including purchases over $5,000 and freight carloads varying from 20 to 50 tons), and tended to restrict petitioner from making sales it did not have covered by inventory or could not cover within a few pounds of metal within a day or so. This understanding was an informal one and not directly reflected in the minutes of any corporate action. It caused petitioner to obtain approval for all major transactions but did not limit the size of the orders.

While thus operating, petitioner both made profits and incurred losses on various transactions. Both before and after the termination of Edison control, petitioner and Zack were free to engage and did engage in speculative transactions in the metals business. Such latitude of operation permitted petitioner to use Zack's judgment as to what the metal market would be in the future and to take a long or short position and to profit thereby, depending upon the accuracy of Zack's judgment.

From 1931 to 1937, inclusive, both formal and informal weekly meetings were held by petitioner's board of directors. M. W. Zack had no individual control over salary and expense payments by petitioner. Petitioner's board of directors established policies regarding these matters.

During the years when Detroit Edison directors were on petitioner's board, petitioner did more business with the refineries because it could get its money quicker.

On the above facts, petitioner claims that under section 722 (b) (4) it "changed the character of the business" in that it had a change in the operation or management of the business, had a difference in its capacity for production or operation, and had a difference in the ratio of nonborrowed capital to total capital. Without concluding that what transpired fulfills these statutory characterizations, we believe that in no event can petitioner prevail since none of the proffered "qualifications" in any manner establishes, as required by the statute, that "because" of them petitioner's average base period net income is an inadequate standard of normal earnings. In *Wisconsin Farmer Co.*, 14 T. C. 1021, 1029, we said:

However, the occurrence of a change in the character of a taxpayer's business for the purposes of securing relief under section 722 is important only if the change directly results in an increase of normal earnings which is not adequately reflected by its average base period net income computed under section 713. * * *

To the same effect is *Farmers Creamery Co. of Fredericksburg, Va.*, 18 T. C. 241, 254.

It is petitioner's first contention that it had a section 722 (b) (4) "change in the operation or management of the business" during the

base period when Detroit Edison was paid off in 1937 and ceased to have any control over petitioner's business policies. At that time Detroit Edison's representatives ceased to be members of petitioner's board of directors, and such conservative or restraining influences as they exercised in petitioner were lifted. It is obvious from the financial history of petitioner's operations for all the period during which it was under the Detroit Edison conservative control that petitioner had marked success. But it is petitioner's theory that without the restraint by Detroit Edison it could have made full use of Zack's abilities as a trader in the metals market, and in a rising or falling market it could have greatly increased its earnings from speculation.

These "brakes" upon petitioner's alleged potential profits were released by the end of 1937, and it would be expected that 1938 would disclose a more successful operation for petitioner. However, the record discloses that exactly the contrary is true. In 1937, when the restraints were still in effect, petitioner had about $4,500,000 of net sales, about $92,500 gross profit, and about $11,000 net income before taxes. On the other hand, in 1938, when petitioner was free to speculate, its net sales had dropped to about $1,500,000, its gross profit to about $75,000, and its net income to about $1,200. It is obvious that the alleged change in operations resulted in no substantial beneficial change in the earnings of petitioner's business and cannot qualify under section 722 (b) (4).

Without considering the pressures of World War II on the copper market in 1939, we do not believe that it serves petitioner's case to point to the more successful showings in that year since, as we have indicated, the effect of any change should have been evident in 1938. There should have been no lag in results nor was development necessary for Zack to exercise his speculative ability. Petitioner's activities in 1938 should demonstrate what he could produce. His abilities were no different in 1939 than they were in 1938. We do not mean to suggest by reference to 1939 that petitioner has established that there was any causal connection between any changes peculiar to it which brought about the success it had in 1939.

In the face of the foregoing, it is impossible for us to conclude that on this aspect of its case petitioner has demonstrated that its situation prior to 1938 was responsible for any distortion of its based period income. Petitioner did well and prospered while under the guidance of Detroit Edison. Its methods and operations under Edison guidance during the business uncertainties of the 1930 to 1936 period resulted in profitable years. It did not do as well during the first year it was on its own. Since speculation can result in heavy losses as well as large profits, it could well be that this in part was the cause of petitioner's poor showing in 1938 and good showing in 1939. This

whole concept of speculation is too uncertain, transient, and ephemeral to sustain petitioner's position on the facts before us.

Petitioner's further contention is that it had a section 722 (b) (4) change in the character of its business by having a difference in the capacity for its operation during the base period. This difference in capacity for operation is thought to stem from the fact that in December 1939 petitioner increased its capital by $19,600, and from the proposition that its capital would have increased and been larger earlier had it not been called upon to make the payment on account of its indebtedness to Detroit Edison and to the receiver of the bank. Without passing upon the possibility of the amounts which it owed to Detroit Edison and the bank finding their way into increased salary for Zack or larger dividends, had petitioner not been required to pay them, we are forced to conclude that petitioner has not established that there was any correlation between the amount of its working capital and its sales and net earnings. This means that, similarly with the first proposition, petitioner has not shown that the absence of the capital in question caused petitioner's average base period net income to be an inadequate standard of normal earnings. That this correlation is absent is clear from the record. As petitioner sets forth in its brief, at the end of 1938 it had almost twice as much capital stock outstanding as it had at the end of 1937; at the end of 1938 it had approximately a third more net liquid working capital than it had at the end of 1937; and at the end of 1938 it had approximately a one-half greater net worth than it had at the end of 1937. But in spite of these indicia of increased capital in 1938, 1937 was by far a more successful year than 1938, as is evidenced by the following comparisons:

|  | 1937 | 1938 |
|---|---|---|
| Net sales | $4,491,624.32 | $1,560,485.22 |
| Gross profit from trading | 92,509.25 | 75,062.01 |
| Net income before taxes [1] | 11,079.84 | 1,222,44 |

[1] Zack's salary was $30,000 in 1937 and $26,030 in 1938.

It must be concluded that petitioner has not demonstrated that the presence of increased capital would be directly reflected in earnings. As in the first situation discussed, petitioner's method of doing business was such that there could be no suggestion of a lag in time before the effect of additional capital would appear.

Zack testified to the advantages to petitioner which would necessarily flow from additional capital, but we are not able to accept this testimony at face value in the light of the foregoing facts. And see *Pabst Air Conditioning Corporation,* 14 T. C. 427, 436, 437.

Moreover, a further infirmity in petitioner's presentation of this phase of its case is the fact that it deals only with the annual net profit and the number of times the working capital was turned over

during the year. It could well be that transactions which resulted in loss were greater in number and would have been of greater magnitude with more working capital available, and the transactions which resulted in gain could have been the same number and without the use of the additional working capital. Petitioner has not demonstrated that in this business there is a definite and constant ratio between varying amounts of working capital and profits.

Petitioner also says in its brief that the high price of copper limited the amount of business it could do with the same capital. But the facts show that 1937 prices of copper and other metals were higher than in any year since 1929; that petitioner's operation in 1937 produced more business than in any other year during the period 1931 through 1939; and that 1937 was the year when it had the smallest amount of working capital during the period 1933 through 1939. And 1937 was also the year when petitioner was doing business primarily with the mills, which it claims would also have had a depressing effect upon it because their method of transacting business tied up capital.

If there be any further need to show the weakness of petitioner's case, its contention that its success was at least 75 per cent dependent upon its capital because its capital was tied up with advances to suppliers and delay in payment from the mills is contrary to the record. If this proposition is sound, how could there be turnovers of working capital at the rate of 132.9 in 1937 and at the rate of 47.86 in 1938 when petitioner's liquid working capital for 1937 was $32,601.53 and $42,557.96 for 1938?

Petitioner makes no argument with reference to its qualification by reason of its alleged difference in ratio of nonborrowed capital to total capital, other than that additional capital at the end of the base period increased its capacity to do profitable business. Cf. Regs. 112, sec. 35.722-3 (d) (4). This argument has been fully answered above.

Petitioner has not seriously pressed its contention that it is entitled to relief under section 722 (b) (5) and we cannot find any merit in the point.

Reviewed by the Special Division.

*Decision will be entered for the respondent*