HUTTIG SASH & DOOR COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 11795. Filed December 19, 1955.

*Ferdinand Tannenbaum, Esq.*, for the petitioner.
*David Karsted, Esq.*, for the respondent.

558

**OPINION.**

TURNER, *Judge:* It is the claim of the petitioner that its excess profits tax for the years 1940, 1941, and 1942 computed without the

benefit of section 722 of the Internal Revenue Code of 1939 [3] results in an excessive and discriminatory tax, and that it qualifies for section 722 relief because of five changes in the character of its business within the meaning of section 722 (b) (4) and because its business was depressed in the base period within the meaning of section 722 (b) (3) (A).

To qualify under section 722 (b) (4) for the relief provided by section 722 (a), a taxpayer's average base period net income must have been an inadequate standard of earnings because "the taxpayer, either during or immediately prior to the base period, commenced business or changed the character" of its business and its actual "average base period net income" did "not reflect the normal operation" of the business "for the entire base period." And for the purposes of section 722 (b) (4), there was a change in the business if during or immediately prior to the base period there was "a difference

---

[3] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except that, in cases described in the last sentence of section 722 (b) (4) and in section 722 (c), regard shall be had to the change in the character of the business under section 722 (b) (4) or the nature of the taxpayer and the character of its business under section 722 (c) to the extent necessary to establish the normal earnings to be used as the constructive average base period net income.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

\* \* \* \* \* \* \*

(3) the business of the taxpayer was depressed in the base period by reason of conditions generally prevailing in an industry of which the taxpayer was a member, subjecting such taxpayer to

(A) a profits cycle differing materially in length and amplitude from the general business cycle \* \* \*

\* \* \* \* \* \* \*

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished. \* \* \*

in the products or services furnished" or a difference in the taxpayer's "capacity for production or operation." It is also provided that if, by the end of the base period, the business did not reach "the earning level it would have reached if the taxpayer had * * * made the change * * * two years before it did so, it shall be deemed to have * * * made the change at such earlier time."

It is the claim of the petitioner that there were five such changes in the character of its business either during or immediately prior to the base period. The claimed changes were (1) the execution of the contract with Insulite on January 21, 1935, and the subsequent selling of Insulite products thereunder; (2) the distribution of Andersen windows, beginning in the spring of 1937; (3) the manufacture and sale of venetian blinds, commencing in 1935; (4) the elimination of a substantial competitor through the purchase of the wholesale business of W. J. Hughes & Sons Company in 1936; and (5) the construction, in 1937, of a new plant and facilities replacing the Knoxville warehouse of the recently acquired Hughes Company business. As to Insulite products, Andersen windows, venetian blinds, and the Knoxville facility, it is the claim of the petitioner that its business had not, by the end of the base period, reached the earning level it would have reached if each of the changes had been made 2 years before it was. As to the Louisville branch, the petitioner concedes that its business did reach its normal level of earnings in 1939.

It is the position of the respondent that neither the execution of the contract with Insulite on January 21, 1935, and the subsequent selling of Insulite products thereunder, the distribution of Andersen windows, beginning in the spring of 1937, nor the construction of a new plant and facilities at Knoxville, in 1937, was a change in business within the meaning of section 722 (b) (4). He concedes that the commencement of the manufacture and sale of venetian blinds in February of 1935 was such a change, but takes the position that by the end of the base period the venetian blinds business had reached a normal earning level. He likewise concedes that the acquisition of the Hughes Company business and assets in September of 1936, was a change in the character of the petitioner's business within the meaning of the said section, but contends that the earnings realized by the petitioner from the Hughes Company business after its acquisition and during the base period were normal.

### Insulite Products.

Whatever the significance which may be attached to the January 21, 1935, contract with the Insulite Company, certain it is that it did not mark the beginning of the sale of Insulite products by petitioner to its customers since the facts show that fairly substantial sales had

been made under the 1933 contract by all of petitioner's branches at least as early as 1934 and by the Columbus branch since it had been acquired in 1926. It is to be noted also that petitioner makes no claim that the selling of Insulite products under the 1933 contract was a commencement of such sales "immediately prior to the base period," and as respondent points out, it has been held that events occurring in 1933 and 1934 were not, for the purposes of section 722 (b) (4), "immediately prior to the base period." *Monarch Cap Screw & Manufacturing Co.*, 5 T. C. 1220; *Acme Breweries*, 14 T. C. 1034; *A. B. Frank Co.*, 19 T. C. 174; and *West Flagler Amusement Co.*, 21 T. C. 486. Equally, if not more, significant, however, is the absence of proof that the petitioner had not been selling a line of products similar or comparable to Insulite products, even though it had not dealt in the products of the Insulite Company itself. See *Stonhard Co.*, 13 T. C. 790; *Triangle Raincoat Co.*, 19 T. C. 548; and *Permold Co.*, 21 T. C. 759. Cf. *Lamar Creamery Co.*, 8 T. C. 928, and *7-Up Fort Worth Co.*, 8 T. C. 52.

To support its claim that a difference in its products, and therefore a change in the character of its business within the meaning of section 722 (b) (4), was effected by the execution of the January 21, 1935, contract and the subsequent selling of Insulite products thereunder, petitioner puts its emphasis on the comprehensive character of the contract, stressing the point that for the first time an arrangement, complete as to details, for its handling of those products was established; that beginning with that contract, petitioner, with few exceptions, was to have certain sales territory exclusively; that thereafter it set up an engineering staff which would be available for consultation and advice to prospective purchasers of Insulite products; and, finally, that the force of its claim is clearly indicated by the fact that the volume of its Insulite products business generally increased each year thereafter through 1939. No ultimate purpose would be served, however, even if we should determine that the consummation of the 1935 contract did effect a difference within the meaning of the statute in petitioner's products and services, as the petitioner contends, rather than a normally expected development of its Insulite business, conducted by the Columbus branch as early as 1926 and by all other branches beginning with the 1933 contract, and not therefore a qualifying factor under section 722 (b) (4), as the respondent contends, since, for reasons appearing hereafter, we are still unable to conclude on the proof herein that petitioner has made its case.

For the purpose of securing relief under section 722, the occurrence of a change in the character of a taxpayer's business is important only if the change directly resulted in an increase in normal earnings, and because the change occurred in the base period, or immediately

prior thereto, the operation was not at a normal level for the base period and the consequence was that the actual average base period net income computed under section 713 did not adequately reflect a normal operation for the entire base period. *Wisconsin Farmer Co.*, 14 T. C. 1021, 1029; *Farmers Creamery Co. of Fredericksburg, Va.*, 18 T. C. 241, 254; *Permold Co., supra; Pratt & Letchworth Co.*, 21 T. C. 999; *M. W. Zack Metal Co.*, 22 T. C. 349, 352; and *Union Parts Mfg. Co.*, 24 T. C. 775.

Our first difficulty in applying the above test to the instant case is that we do not know what petitioner's base period net earnings from the sale of Insulite products were, and such being the case, it would hardly be possible to justify the conclusion that, insofar at least as the net profits from Insulite sales were concerned, the petitioner's actual average base period net income did not reflect a normal operation for the entire base period. Admittedly, petitioner's net profits on Insulite sales are not segregated or separately shown on any records maintained during the base period or prior thereto, and in an effort to establish such net profits, for the purposes of its section 722 claims, it prepared elaborate retrospective schedules and offered them in evidence.

The schedules in question purported to show, by branches, petitioner's total dollar sales of all products for each of the years 1934 through 1939, the cost of the goods sold, and according to the various categories, such as salaries, commissions, general office expense, insurance, etc., the total of its selling and administrative expenses, and finally, the total of its resulting net profits. With respect to Insulite products and for the same years, the schedules purported to show the same facts in comparable detail.

In the case of the Insulite products, however, it was apparent on the face of the schedules that, excepting possibly the amounts paid to the Insulite Company in respect of Insulite sales and one or two items of expense, none of the items under cost of goods sold or selling and administrative expenses represented petitioner's actual outlay in the various categories. To the contrary, they were admitted and obvious allocations made on the basis of widely varied percentage factors from the total of the expenditures by the petitioner under the various headings in its over-all operations.

The admission of the schedules in evidence was objected to by the respondent, but after a conference between counsel, at the instigation of the Court, it was stipulated that the figures relating to petitioner's total sales, the costs thereof, and the selling and administrative expenses relating thereto, as listed in the schedules, were as shown by petitioner's books of account, and further, that the amounts shown as the total dollar sales of Insulite products for the years in question

were likewise true and correct. As showing the facts agreed upon, the schedules were admitted in evidence. As to the remaining parts of the schedules, the petitioner was left to its proof.

The petitioner's dollar sales of Insulite products by branches and for the years 1934 through 1939, as shown by the above schedules and stipulated as above stated, appear in our Findings of Fact. The amounts claimed by petitioner as its purchases of Insulite products and as its realized net profits on Insulite sales for the said years, and as shown by the schedules, are as follows:

### Claimed Insulite Purchases

| Branch or warehouse | 1934 | 1935 | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|---|---|
| St. Louis | $22,692 | $40,390 | $42,797 | $49,913 | $40,194 | $56,792 |
| Columbus | (¹) | (¹) | 17,520 | 1,582 | 9,435 | 24,818 |
| Jacksonville | 5,124 | 11,282 | 13,727 | 12,648 | 26,093 | 12,832 |
| Roanoke | 6,549 | 26,981 | 27,744 | 31,663 | 36,497 | 40,164 |
| Charlotte | 4,409 | 16,694 | 18,061 | 25,992 | 28,323 | 33,838 |
| Louisville | | | | 13,575 | 19,120 | 30,775 |
| Knoxville | | | | 9,766 | 22,241 | 29,709 |
| Total | 38,774 | 95,347 | 119,849 | 145,139 | 181,903 | 228,928 |

¹ Not available.

### Claimed Net Profits

| Branch or warehouse | 1934 | 1935 | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|---|---|
| St. Louis | $189.64 | $3,334.91 | $2,439.50 | ($1,252.52) | ($3,335.50) | ($4,858.61) |
| Columbus | | | 357.64 | 49.75 | (387.90) | 170.91 |
| Jacksonville | 177.61 | 1,064.95 | (1,602.42) | (1,767.79) | (363.08) | (1,996.20) |
| Roanoke | 129.91 | 5,968.28 | 4,216.37 | 5,647.02 | 7,445.85 | 8,366.20 |
| Charlotte | 78.82 | 2,917.60 | 2,670.39 | 3,543.24 | 3,750.30 | 4,413.56 |
| Louisville | | | | 34.31 | (398.60) | 316.13 |
| Knoxville | | | | 651.90 | 1,268.21 | 3,779.03 |
| Total | 575.98 | 13,285.74 | 8,081.48 | 6,905.91 | 7,979.28 | 10,191.08 |

In making its allocations of costs and expenses to arrive at its claimed net profits on the Insulite sales made by a particular branch for a given year, the petitioner first determined the percentage of Insulite sales to the total sales of the branch and then applied that percentage factor, or one-half thereof, to the total of the expenditures of the branch for the year in the category being allocated. From the testimony of the official who made the allocations appearing in the said schedules, the application of the whole of the percentage factor, or one-half thereof, appears to have been bottomed in some way not at all clear on the proposition that, except as to Insulite, the expenditures and costs from which the allocations were being made were to be regarded as having been related to millwork products, and since in the case of millwork there were greater nonproductive or handling costs than in the case of Insulite, the allocation of nonproductive costs to Insulite sales should be made by use of only one-half of the above

percentage factor. Just why nonproductive costs and expenses relating to Insulite sales should ratably be one-half the nonproductive costs and expenses relating to millwork and other items sold by petitioner has not been demonstrated and is not clear, support therefor insofar as we have been able to determine being limited to the stated conclusion of the officer who made the allocations and the asserted approval thereof by petitioner's auditors. In short, except for the unsupported opinion of the witness, we do not know whether the amounts allocated from nonproductive costs and expenses as the costs of Insulite sales bear any resemblance to actual costs, nor whether an analysis of the total of such costs and a study of the Insulite operations in comparison with total operations could or could not produce a satisfactory showing of actual costs and expenses.

In the case of salesmen's commissions, an entirely different factor was applied. More often than not, the percentage was 3½ per cent of 80 per cent of sales, but in numerous instances, and without explanation, the factor applied was 3½ per cent of 85 per cent of sales. At first blush, it might be reasonable to conclude that the percentages applied were supposed to represent the established rates of commissions paid by the petitioner in respect of the sales of all of its products for the given year, either throughout its territory or in the territory of a particular branch. Such, however, could not be the case, since in the same schedules and with respect to Andersen windows the allocation of commissions in every instance is at the rate of 3½ per cent of 85 per cent of sales. Furthermore, with respect to Insulite, the allocations are shown at 3½ per cent of 80 per cent of sales for one or more branches, while for another branch or branches and for the same year, at 3½ per cent of 85 per cent of sales, and in the case of the Roanoke branch, for the years 1934 through 1937, the schedules show allocations at 3½ per cent of 80 per cent of 85 per cent of sales.

In allocating the costs of merchants' licenses, still another percentage factor was applied in all instances. The explanation is not clear, but it was said that the factor used was arrived at in each instance through an analysis of such licenses, and that inventory normally entered into the determination of merchants' licenses, but in the case of Insulite, petitioner had no inventory of its own, since the Insulite products were handled on a consignment basis and actually belonged to the Insulite Company. Strangely enough, the factor used in allocating the costs of merchants' licenses was in each instance likewise applied in allocating social security taxes. Just what the connection was between merchants' licenses and social security taxes, or what, if anything, the presence or absence of inventories had to do with such taxes, we are not advised.

Two of the consistently larger items under selling and administrative expenses were shown as "Salesmen's-Salaries, Spec. Men" and "Salesmen's Expenses." The amounts so shown are not the result of application of any of the percentage factors appearing, and there is some indication in the testimony of petitioner's officer witness that they are supposed to represent the amounts actually expended for the purposes stated. Similarly, the amounts shown in each instance as purchases of Insulite products were purportedly the amounts transmitted to the Insulite Company in respect of the Insulite products sold and were as shown by the invoices submitted to petitioner by that company. If the amounts so shown as salesmen's salaries, salesmen's expenses, and the purchases of Insulite products sold were the amounts actually so expended, it is not clear just why the petitioner failed to submit the invoices or the books showing the said salaries and expenses, make a proper showing of a summary therefrom, or produce them for examination by respondent's counsel and possible stipulation with respect thereto.

It thus appears that when the last word has been said, the amounts applied as costs and expenses in arriving at the claimed base period net profits from Insulite sales, except possibly the cost and expense items covered in the preceding paragraph, are, insofar as shown by the proof, merely the amounts which in the opinion of the officer making the allocations approximate such costs and expenses. There are, of course, occasions when there is no available direct evidence of an ultimate fact and resort to opinion testimony appears to be the only recourse. But if an opinion is to be regarded as much, if anything, more than a guess, there should be some proof or agreed factual basis therefor. *Pabst Air Conditioning Corporation*, 14 T. C. 427, 436, 437; *Beringer Bros., Inc.*, 18 T. C. 615, 642–644; and *7-Up Fort Worth Co., supra*. We have no doubt that the allocations appearing on the above schedules were, in the opinion of the witness who made them, fair and reasonable, but as to the factual basis therefor, we are, for the most part, not advised. Accordingly, we have made no finding of the amount of petitioner's base period net profits on Insulite sales.

Aside, however, from the above difficulties as to proof of the net profits which were actually realized by petitioner during the base period on Insulite sales, we are unable to see just how the net profits therefrom as claimed, even if accepted as actual, would or could justify the conclusion that due to the taking on of the Insulite products line, petitioner's actual base period net earnings did not reflect a normal operation for the entire period, whether the taking on of the line be said to have occurred under the 1933 contract or the contract of January 21, 1935.

It is true, of course, that beginning with 1935, the first year of operations under the January 21, 1935, contract, and through 1939, the volume of Insulite sales did show consistent and substantial increases both in quantity of Insulite products sold and the dollar volume of the sales made, and if the relief sought turned on the proposition that the Insulite business did not reflect a normal operation for the entire base period because, due to the taking on of the Insulite products line during or immediately before the base period, the quantity of products sold and the dollar volume of the sales made in the base period were not at a normal level for the entire base period, there might be some justification for petitioner's conclusion. The prerequisite for relief, however, is that by reason of the change either during or immediately prior to the base period, the actual net profits for the base period did not adequately reflect a normal operation for the entire base period. And if the base period net profits from the sale of Insulite products in the amounts claimed by petitioner as its actual net profits be accepted as correct, we have no such consistent or substantial increase in such profits for the years 1935 through 1939. In fact, the net profits as claimed for 1935 were substantially greater than the claimed net profits for any one of the base period years. It is to be noted also that even though the quantity of Insulite products sold and the dollar volume of the sales made in the years 1935 through 1939 were consistently and substantially increasing from year to year, the net profits therefrom as claimed by petitioner were consistently and substantially decreasing from 1935 through 1937, and it was only with respect to 1938 over 1937 and 1939 over 1938 that the trend was reversed and they began to increase. And even then, the net profits for 1939 as claimed were still approximately 23 per cent less than the claimed net profits on 1935 sales, even though the quantity of Insulite products sold was approximately three times and the dollar volume of the sales more than twice those for 1935. Why this should be so, the record does not show.[4] Whether it is due to substantial error in the amounts of costs and expenses allocated by petitioner's officer in arriving at its claimed net profits from Insulite sales, or whether it was due to other factors not primarily or substantially attendant upon the taking on of the Insulite line of products, whether under the 1933

---

[4] On brief, it is asserted that the profits in 1936 and 1937 were low, due to engineering and development expenses. As to what was covered by the reference to development expenses and under what category it may have been charged in the retrospective schedules, we are not even able to make a good guess. Conceivably, the reference to engineering expenses could have been to the amounts shown on the schedules as salaries and expenses, "Spec. Men." If those items were intended to cover engineering costs, they are, as heretofore noted, amounts asserted or claimed but not proved. Furthermore, such charges in the said schedules were not new to 1936 and 1937, for which the net profits as claimed were low, but they likewise appear on the said schedules for 1935, when, as noted above, such claimed net profits were substantially higher than for any year through 1939.

contract or the 1935 contract, we are unable to tell. If the latter happens to be the explanation, then, of course, it is not covered in the claim made. *Lamport Co.*, 17 T. C. 1079, 1084, and *Trunz, Inc.*, 15 T. C. 99, 104, 105.

In that same connection, the claimed results of petitioner's Insulite business according to the operations of the individual branches are, if possible, even less persuasive of merit in the claim herein. On first impression, the claim would appear to be supported by the claimed results of operations of the Charlotte and Roanoke branches, since as to those branches the claimed net profits, after a falling off in 1936 in comparison to 1935 in the case of the Charlotte branch and a similar falling off in 1936 and 1937 in the case of the Roanoke branch, indicated consistent and steady gains each year thereafter through 1939, and for 1939 indicated an increase of approximately 51 per cent over 1935 for the Charlotte branch and approximately 40 per cent for Roanoke. With respect to the St. Louis and Jacksonville branches, however, the indicated experience was directly to the contrary. On the basis of the dollar volume of sales, the Insulite business of the St. Louis branch was substantially greater than that of any other branch, and yet, even according to petitioner's own representations as per the retrospective schedules, there was a steady drop from claimed net profits of $3,334.91 for 1935, to a net loss of $1,252.52 for 1937, and increasing net losses for 1938 and 1939, in which latter year the indicated net loss was $4,858.61. With respect to the Jacksonville branch, after claimed net profits of $1,064.95 for 1935, net losses are indicated for each of the base period years, the net loss for 1939 being shown on the schedules at $1,996.20. In short, the indicated net results of the Insulite business of the St. Louis branch had worsened from 1935 through 1939 by approximately 245 per cent, and during the same period, that of the Jacksonville branch by approximately 287 per cent.

To a substantial extent, the difference between the claimed profitable operations at the Charlotte and Roanoke branches and the indicated unprofitable operations at the St. Louis and Jacksonville branches are accounted for by the ratable differences allocated in the costs and expenses discussed heretofore. To illustrate, the ratio of represented costs and expenses, exclusive of payments made to the Insulite Company on account of goods sold, to the total sales for the St. Louis branch ranged from a low of approximately 14 per cent for 1935, to a high of approximately 29.3 per cent for 1938, and in the case of the Jacksonville branch, from a low of approximately 11 per cent for 1935, to a high of approximately 33 per cent for 1939. With respect to the Charlotte and Roanoke branches, the corresponding percentages were substantially less. At the Charlotte branch, the percentage for

1935 was approximately 12.7 per cent, and from that point increased to a high of only approximately 16 per cent for 1939. At the Roanoke branch, the approximate percentages for 1935 and 1939 were 12.4 per cent and 14.7 per cent, with intervening percentages of approximately 17.4 per cent for 1936, 16 per cent for 1937, and 11.6 per cent for 1938. Another point of contrast on the basis of the figures appearing in the retrospective schedules is in the percentage of claimed gross profits to sales, the approximate percentages for the years 1935 through 1939, for the four branches, being:

| | 1935 | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|---|
| St. Louis | 20.7 | 20.7 | 20.7 | 22.9 | 19.1 |
| Jacksonville | 18.4 | 18.4 | 18.4 | 17.2 | 20.7 |
| Charlotte | 25.7 | 25.7 | 25.7 | 25.7 | 25.8 |
| Roanoke | 29 | 28.3 | 28.3 | 26.6 | 29.7 |

As to how such extremely varied and contrary operating results as between branches may be reconciled with the petitioner's claim that its Insulite business was not at a normal level for the base period because of the taking on of the Insulite products line immediately prior to the base period, namely, under the arrangement provided for in the contract of January 21, 1935, does not appear. It follows, we think, and we hold, that petitioner has failed to substantiate its claim as to Insulite products, and the claim is accordingly rejected.

*Andersen Products.*

With respect to Andersen products, the petitioner's claim must likewise be rejected. It is, of course, true that petitioner did not begin handling those products until the spring of 1937, and if they were of such character as to represent a new or different product within the meaning of the statute, the change did occur within the time specified for qualifying for relief.

Actually, however, we know even less about the profits results from the handling of the Andersen products than in the case of Insulite. The evidence does show petitioner's purchases for the base period years, and it is our understanding that the inventory figures at the beginning and end of the respective years are actual. In short, we are to that extent in a position to determine the cost of the Andersen products sold, but we do not know the amounts for which they were sold, and hence the net results, or whether those results were profits or losses. Furthermore, the state of the record with respect to other costs and expenses relating to the sales of Andersen products is comparable in all pertinent aspects to that outlined above as to Insulite.

The petitioner has shown of record a rather detailed description of Andersen windows for the purpose of demonstrating that they were in

fact a different product from its regular line of windows, frames, and sash, whether custom built or stock, and, therefore, qualified as a difference in its products under the statute. In view, however, of the failure to show the results of its handling of the Andersen line for the base period years, we have no way of knowing whether with respect thereto it would otherwise be qualified for relief. See *Wisconsin Farmer Co.*, *supra; Farmers Creamery Co. of Fredericksburg, Va., supra; Permold Co., supra; M. W. Zack Metal Co., supra;* and *Union Parts Mfg. Co., supra.* It may well be that the absence of any segregation on petitioner's books of its sales of Andersen products, or the expenses relating thereto, is an indication that during the base period and prior to the excess profits tax years at least, the petitioner itself did not look upon the Andersen products as a line of goods substantially different from the line of goods theretofore sold. See and compare *Stonhard Co., supra.*

*Venetian Blinds.*

The respondent concedes that the commencement of the manufacture and sale of venetian blinds in February of 1935 did constitute a change in the character of petitioner's business within the meaning of section 722 (b) (4), but he does not agree that $22,307, as contended for by petitioner, is a fair and just amount to be used as petitioner's average base period net income from its venetian blinds operations, it being his claim that $6,169 is the just and fair amount to be so used. It is our view that in their construction of the amounts contended for, both parties have taken steps and have proceeded on the basis of factual conclusions not supported by the evidence, and under the statute, neither amount is a fair and just amount to be used for the purposes stated.

Although the respondent in his construction has proceeded on a contrary basis, we are satisfied from the evidence, and have found as a fact that petitioner's venetian blinds business, by the end of the base period, had not reached the earning level it would have reached if the business had been commenced 2 years before it was. On the other hand, it is not at all clear from the evidence that with an additional 2 years of operations the volume of petitioner's sales would have increased by the end of 1939 to the level indicated by a straight line projection of its actual sales for a further period of 2 years, as petitioner contends.

Having reconstructed venetian blinds sales in the manner indicated, petitioner next computed its 1939 constructive net profits therefrom by applying its actual 1939 venetian blinds profits factor of .0702 to 1939 sales as reconstructed. It then concluded or assumed that a proper amount to be regarded as its constructive average base period venetian blinds net profits would stand in relation to its reconstructed 1939 venetian blinds net profits as its base period millwork net profits for its

St. Louis, Jacksonville, Columbus, Roanoke, and Charlotte branches were to its 1939 millwork net profits for those branches. Claiming that its 1939 millwork net profits for the five branches were, in round numbers, 75 per cent of its average base period millwork net profits for the said branches,[5] and then treating its 1939 constructive venetian blinds net profits as being 75 per cent of its constructive average base period venetian blinds net profits, it arrived at the $22,307 contended for. Stated differently, it concluded that its constructive average base period venetian blinds net profits would be the amount representing 133⅓ per cent of its reconstructed 1939 venetian blinds net profits.

It is with this last step of petitioner's construction that we have our major difficulty. We have found nothing in the evidence to support the proposition that petitioner's base period trend of millwork net profits, or the relation of such net profits for the year 1939 to the average of the net profits therefrom for the base period, would in any way be indicative of the base period net profits which normally might have been expected from venetian blinds. As a matter of fact, one factor strongly urged by petitioner as indicating that its venetian blinds business had not reached a normal level of earnings by the end of 1939, was that it was only when drastic departures were made from the usual methods used by petitioner in marketing its millwork that it began to make real headway in the marketing of venetian blinds, and that the full force of that change in marketing procedures had not run its course by the end of the base period. Furthermore, the petitioner, in its reply brief, concedes that "obviously" venetian blinds sales would not follow the sale of millwork.

The reason advanced in justification of the application of the above millwork net profits ratio to arrive at constructive average base period net profits for venetian blinds was that to determine a normal operation for a taxpayer, use should be made of representative base period activities of such taxpayer, and millwork being the principal business of petitioner and the millwork of the 5 branches being a large portion of the petitioner's entire business, it was accordingly representative of petitioner's base period activities. In support of this claim, E. P. C. 8, 1947–1 C. B. 73, is cited. Rather obviously, no rule of thumb, whether suggested in a published bulletin or even by regulation itself, is to be blindly applied, to say nothing of a situation, as in this case, where on the evidence its application would tend to bring about a distorted result and would not reflect the normal situation contemplated by the statute.

We find no support in the facts of record for the conclusion that if petitioner had started its venetian blinds business 2 years before it did

[5] On the evidence, we should be hard pressed if it should become necessary to make a finding of fact as to petitioner's millwork net profits for the 5 branches mentioned, either for the year 1939 or for the base period years. The evidence in many respects is quite indefinite and far from satisfactory.

its average base period net profits in a normal operation thereof would have been ratably any higher than they actually were for 1939. And in arriving at our conclusion as to "a fair and just amount representing normal earnings" to be used as petitioner's "constructive average base period net income," we have made due allowance for the increased sales of venetian blinds and the correspondingly added amount of profits for 1939 which, as we read the evidence, petitioner would have experienced if its venetian blinds operation had commenced 2 years before it did.

### Hughes Company.

The petitioner's acquisition of the business and assets of W. J. Hughes & Sons Company in September of 1936, but as of August 22, 1936, is conceded by respondent to have been a change in the character of the petitioner's business within the meaning of section 722 (b) (4), inasmuch as it eliminated a competitor, and resulted in increased capacity for petitioner. His concession, however, is with respect to such acquisition as a unit, embracing both the Louisville and Knoxville facilities, designated at first by petitioner as Hughes Division— Huttig Sash & Door Company, and after 2 years, as Huttig Sash & Door Company—Hughes Division. Respondent's contention is that the Hughes Division experienced normal earnings during the period August 22, 1936, to December 31, 1939, and the decline in the percentage of net profits to sales being in harmony with petitioner's operations as a whole, the proper and reasonable method of construction was to "annualize" the Hughes Division profits for the period August 22 to December 31, 1936, to arrive at what would have been normal for 1936, and that the results, averaged with actual net profits for 1937, 1938, and 1939, would give the amount to be used as the constructive average base period net profits, or an increase over the average of net income from August 22, 1936, to December 31, 1939, of $11,030.78. In his construction, the respondent made no allowance for the erection of the new and added facilities at Knoxville.

The petitioner, in its construction, has proceeded on the theory or assumption that the Louisville and Knoxville operations should be dealt with separately. It concedes that the Louisville operation was normal for 1939, but contends for a construction for the base period by applying to its purported 1939 millwork net profits, the factor above described and as contended for in the case of the venetian blinds operation, to arrive at claimed constructive average base period net income for the Louisville operation of $34,325. As to the Knoxville operation, it is claimed that, due to the construction of the new facility in 1937, the business had not reached the earning level which it would have reached by the end of 1939 if the change had occurred 2 years

before it did. It accordingly reconstructed 1939 millwork sales by assuming that with an additional 2 years of operation millwork sales would have been increased over its actually experienced 1939 sales by the same percentage that such sales were greater than 1937 sales. To such reconstructed 1939 millwork sales, it then applied its purported 1939 millwork net profits factor and arrived at claimed reconstructed 1939 net profits, and then to such reconstructed 1939 net profits applied the factor contended for with respect to venetian blinds, to arrive at claimed constructive average base period net income for Knoxville of $36,624.

On the record before us, we are unable to accept the construction of either party. The facts show that in the purchase of the business and assets of the Hughes Company one competitor, not two, was eliminated, and that the business of the competitor was centered in Louisville, where the manufacturing and processing were done, with distributing warehouses in Knoxville and Paducah. Such being the case, we think the respondent properly treated the Hughes Division as a unit in making his construction of the amount to be used as the constructive average base period profits due to the elimination of the Hughes Company as a competitor. Furthermore, beyond the petitioner's assertion to that effect, we have found nothing of substance to indicate that from the effective date of acquisition through 1939, the net profits of the Hughes Division, both Knoxville and Louisville and for the period indicated, were, to say the least, any lower than would result from a normal operation of the Hughes Company business which had been acquired. We are of the view, however, that the respondent was in error in refusing to give any effect to the erection in 1937 of the new plant in Knoxville. We are satisfied from the evidence that it resulted in a sufficiently substantial increase in petitioner's capacity for operation to justify its being taken into account in the construction herein, and further, that the business of the Knoxville facility resulting from the erection of the new plant did not reach the earning level it would have reached if it had had the new plant 2 years before it did.

On the other hand, it does not follow, as petitioner has apparently assumed, that the increase in sales from the Knoxville facility and the net profits thereon from 1937 to the end of 1939 was wholly, or even in major part, attributable to the erection of the new plant. Prior thereto, the millwork for the Knoxville distribution was done at Louisville. The new facility was erected in 1937, but we do not know whether it was completed early or late in the year, and, as a consequence, we do not know what portion of the millwork for Knoxville was done at Louisville and what part at Knoxville. Neither is there any indication as to the basis on which the charge for millwork was made as between Louisville and Knoxville. We do know, however,

that the 1937 margin of profits on sales as between Louisville and Knoxville was slightly more than three-tenths of 1 per cent in favor of Knoxville, whereas by the end of 1939, that margin had increased to approximately 2²⁄₁₀ per cent. It is also quite conceivable that some of the areas served by Knoxville after the erection of its millwork facility were so located that they had theretofore been served directly from the millwork plant at Louisville, rather than by shipping the goods first to Knoxville and then redistributing them to the purchasers.

The evidence also shows that prior to the purchase, the petitioner had been a rather heavy competitor of the Hughes Company. Petitioner's sales in the Louisville and Knoxville areas, prior to the purchase, had been made from the plant in St. Louis, and there is no indication that petitioner in its construction has made any allowance either with respect to Louisville or Knoxville for the profits which merely represented a shift of profits from the St. Louis plant. It is, of course, likely that the switch from petitioner's St. Louis operations to Louisville and Knoxville was, to some extent, offset by the prior Hughes Company business going to others of petitioner's branches. But we are left wholly in the dark as to the net results and the consequential effect on a proper reconstruction of the base period net profits of the Hughes Division.

In arriving at our conclusion as to "a fair and just amount representing normal earnings" to be used as petitioner's "constructive average base period net income," we have accordingly made such allowance for the elimination of its competitor, the Hughes Company, and the increase in its capacity for production resulting from the construction of the new plant in Knoxville as in our opinion is justified and required on the evidence and under the statute.

*Applicability of Section 722 (b) (3) (A).*

With respect to the applicability of section 722 (b) (3) (A), the petitioner bases its claim on the proposition that its St. Louis and Jacksonville branches were the only facilities in continuous operation from 1923 through 1939, that the territories served by the branches opened subsequent to 1923 were previously served from St. Louis and Jacksonville, and that the elimination of all the changes occurring subsequent to 1923 establishes a proper basis to determine its cyclical experience in the years 1922 through 1939 and whether its business was depressed in the base period years. As supporting that claim, it contends that its millwork sales and net operating profits therefrom for its St. Louis and Jacksonville territories for the years 1922 through 1939 constitute the proper yardstick, compared with other data, to establish that its base period millwork net profits were depressed by reason of conditions generally prevailing in its industry,

thereby subjecting it to a profits cycle materially different in length and amplitude from the general business cycle. It accordingly claims that section 722 (b) (3) (A) is applicable, and by reason thereof, it is entitled to reconstruct its base period net earnings in all of its categories, except venetian blinds and possibly custom millwork, and for all of its branches, and that its average base period net income so reconstructed and including the constructions above claimed under section 722 (b) (4) is $358,307, and is the fair and just amount to be used as its constructive average base period net income.

It is the position of the respondent that the business of the petitioner was not depressed during the base period years.

In an effort to show depressed earnings during the base period, the petitioner used the heretofore discussed retrospective allocations of overhead selling and administration expenses, etc., to segregate millwork operations from Insulite and Andersen products handled by it. Its next step was to make retrospective allocations of sales by States for the years 1922 through 1939. It then selected the St. Louis and Jacksonville operations and compared their estimated average base period earnings with their average long-term earnings as representative of its profits cycle and depressed condition. The elimination of the other branch-facilities was for the purpose of eliminating alleged growth and non-cyclical factors. It would serve no useful purpose, however, to enter into a detailed discussion of the reconstruction so made as the basis for its claimed relief under section 722 (b) (3) (A), because it is our opinion and we hold that petitioner has failed to establish that it is entitled to any relief under that section.

Except for the venetian blinds department, operated as a separate unit, and possibly the custom millwork department in St. Louis, the record clearly establishes that petitioner operated an integrated business of non-custom millwork and various types of building supplies through its St. Louis warehouse department and each of its several branches. The purpose of establishing branches was to render better service to customers in areas formerly supplied by long hauls from St. Louis, and the establishment of each new branch inevitably resulted in a loss of sales by the St. Louis warehouse to such branch. It is in our opinion thus apparent that the millwork sales and profits experienced by the St. Louis and Jacksonville branches for each of the years 1922 through 1939, even if it be assumed that such sales and net profits could be shown, would not and could not be representative of the condition and fluctuations of the petitioner's business over the period 1922 through 1939. Moreover, the fallacy of the proposed segregation of millwork sales and profits for the St. Louis and Jacksonville facilities is demonstrated by petitioner's inability to show any satisfactory and accurate segregation of millwork earnings apart from the business of each facility taken as a whole.

In *A. B. Frank Co.*, *supra*, at page 182, we said, "In the determination of whether this business was depressed, we must look at the entire business and not merely one segment of it." That principle is applicable in the instant case. On the record before us, and looking to the petitioner's business as a whole, we are of the opinion, and have found as an ultimate fact that petitioner's business was not depressed in the base period years 1936 to 1939, inclusive.

We have held above, however, that petitioner has qualified for section 722 relief because its venetian blinds business, commenced in 1935, had not, by the end of the base period, reached the earning level it would have reached if it had been started 2 years before it was and because of the increase in petitioner's capacity for production, due to its elimination of its competitor, the Hughes Company, and the erection of the new plant at Knoxville. Based on that holding, and on the evidence, it is our opinion, and we have so found, that "a fair and just amount representing normal earnings" to be used as petitioner's "constructive average base period net income," for the purposes of section 722, is the amount which exceeds petitioner's average base period net income computed without reference to section 722 by $33,000.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*