*Decision will be entered under Rule 50.*

HAVENS STRUCTURAL STEEL CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 28634.   Filed August 21, 1958.

*Frank E. Tyler, Esq.,* for the petitioner.
*William V. Crosswhite, Esq.,* for the respondent.

FISHER, *Judge:* This proceeding involves respondent's disallowance of petitioner's applications for relief under section 722 of the Code of 1939 and claims for refund applicable thereto for the taxable years as follows:

| Years | Deficiencies | Overpayments claimed |
|---|---|---|
| December 31, 1941 | | $7, 863. 83 |
| December 31, 1942 | $17, 666. 53 | 41, 452. 98 |
| December 31, 1944 | | 6, 768. 65 |
| December 31, 1945 | | 1, 357. 07 |

In its applications for relief under section 722, petitioner claimed a credit based on a constructive average base period net income of $41,013.64 for the year 1941 and $41,013.86 for each of the years 1942, 1944, and 1945. At the trial, petitioner's substantial reliance was di-

rected to drought and insect infestation, and a variant profits cycle, as factors qualifying it for relief.

Upon respondent's determination, the excess profits credit based upon invested capital resulted in the lesser excess profits tax.

FINDINGS OF FACT.

Part of the facts are stipulated and are incorporated herein by reference.

Petitioner is a corporation organized under the laws of the State of Missouri on September 17, 1919, with its principal place of business located at Kansas City, Missouri. Its returns for the taxable years involved were filed with the collector of internal revenue at Kansas City, Missouri. The returns were made on an accrual basis and for calendar years.

Petitioner's business is the fabrication and sale of steel and steel products, the erection of structural steel in construction work, and the warehousing and sale of steel and steel products. These products were used principally in larger types of private and public nonresidential construction and repair, including business buildings, petroleum refineries, gas pipeline works, public utilities, schools, bridges, railroad facilities, and the like. It also manufactured trailers and semitrailers during part of the base period.

Petitioner's trade area covered the States of Missouri, Kansas, Illinois, Nebraska, and Oklahoma with occasional sales in Texas, Arkansas, Iowa, and Wyoming.

Kansas City, Missouri, is located on the western border of Missouri. Kansas City, Kansas; North Kansas City, Missouri; and Independence, Missouri, are integral parts of the greater Kansas City area, or metropolitan area.

The Kansas City Metropolitan District as defined by the Census of the United States population for 1940 consisted of Mission and Shawnee Townships in Johnson County, Kansas; Quindaro, Shawnee, and Wyandotte Townships in Wyandotte County, Kansas; Kansas City, Kansas; Gallatin Township in Clay County, Missouri; Blue, Brooking, and Washington Townships in Jackson County, Missouri; and Kansas City, Missouri.

During the period 1936–1939, inclusive, the Kansas City trade area was served by 12 trunk or main line railroads, 3 airlines, and several bus lines, and truck lines.

Missouri derives the major portion of its income from manufacturing, financial, and commercial activities. Agriculture was an important source of income for the State of Missouri.

Kansas is primarily an agricultural State. Kansas derives a larger percentage of its total income from manufacturing, petroleum, min-

erals, and other industries than does Nebraska. Its principal farm products are wheat, cattle, hogs, and corn. The effects of the drought and, to a lesser extent, insect infestation in the State of Kansas on farm income, and business generally, were slightly less than they were in the State of Nebraska.

Nebraska is essentially an agricultural State. While it has some manufacturing and other industries, its economy is based largely on the production and processing of farm products, the most important of which are cattle, hogs, corn, and wheat.

Beginning about 1934, and extending through petitioner's base period, certain States in the Great Plains Area suffered a severe drought. Severe heat and lack of moisture at the critical stages of development caused an almost total crop failure of major crops in some of those years in some of the States or portions thereof of the Great Plains Area.

In addition to the drought there was also a serious infestation of grasshoppers in Nebraska and Kansas during the base period years which added to the short production of many farm crops over large areas of these States. This damage in the State of Nebraska alone was estimated at between 11 and 12 million dollars in each of the years 1936, 1937, and 1938, and slightly less in Kansas.

The rainfall in Missouri during the base period was 91 per cent of normal. The rainfall in Iowa during the base period was 93 per cent of normal. The rainfall in Oklahoma during the base period was 88 per cent of normal. The rainfall in Arkansas during the base period was 98 per cent of normal.

The year 1939 was normal for the greater Kansas City area with respect to the origin, volume, and value of agricultural products which came into Kansas City.

The drought in the Great Plains Area followed a prolonged general economic depression of the early 1930's. This depression resulted in lower prices for farm commodities.

The loss of farm production and farm income affected all types of business throughout the drought-stricken area, particularly those which depended largely on farm trade.

As a result of the AAA program and the short production of feed crops during the drought period, there was a reduction in the quantity and quality of marketable cattle and hogs during the base period. Large quantities of feed were brought in from other States at additional costs to the farmers, and much of the livestock from the drought areas was sold in poor condition at distress prices. Because of these extra costs of production, there was a proportionately greater reduction in farm net income and purchasing power than there was in gross income.

The farmers of Nebraska, in most instances, exhausted their cash reserves as well as their credit and their spending was reduced to bare necessities. Their houses and farm equipment of all types suffered from lack of repairs and proper maintenance. Government and State agencies instituted various relief programs. The Farm Security Administration made many loans and, in some instances, outright grants to distressed farm families. The Farm Service Administration assisted in working out minimum cost subsistence recipes and budgets. The Agricultural Extension Service of the University of Nebraska organized instruction courses for farm families in repairing and, in some instances, making their household necessities and personal clothing. Feed sacks were used to make underclothes for the children and other wearing apparel; old blankets were converted into clothing; and sewing centers were established where overalls, dresses, and other articles, even toys, were made and distributed free to needy families. Altogether, about 4 million garments and as many other articles were made and distributed free to Nebraska families. At the beginning of 1938, over 200,000 persons, approximately 15 per cent of the total population of Nebraska, were on some form of relief.

The distress conditions described above prevailed not only among the farm families but also in the urban areas, and particularly in the small towns which largely depended upon farm income. The following tables show the total income payments and the per capita income payments to individuals in the United States as a whole and in Kansas, Missouri, and Nebraska over the period 1929 to 1939, inclusive:

PERSONAL INCOME AND PER CAPITA INCOME FOR THE UNITED STATES AND FOR KANSAS, MISSOURI, AND NEBRASKA, 1929–1939

| Year | Personal income ($1,000,000) | | | | | Per capita income (dollars) | | | |
|---|---|---|---|---|---|---|---|---|---|
| | United States | Total three States | Kansas | Missouri | Nebraska | United States | Kansas | Missouri | Nebraska |
| 1929 | 85,661 | 4,085 | 999 | 2,275 | 811 | 703 | 535 | 628 | 590 |
| 1930 | 76,780 | 3,668 | 882 | 2,073 | 713 | 624 | 468 | 569 | 517 |
| 1931 | 65,597 | 3,157 | 751 | 1,838 | 568 | 529 | 399 | 495 | 410 |
| 1932 | 50,027 | 2,307 | 504 | 1,379 | 424 | 401 | 268 | 368 | 306 |
| 1933 | 47,122 | 2,129 | 471 | 1,276 | 382 | 375 | 251 | 338 | 276 |
| 1934 | 53,482 | 2,278 | 532 | 1,394 | 352 | 423 | 285 | 368 | 255 |
| 1935 | 60,104 | 2,822 | 668 | 1,602 | 552 | 472 | 357 | 422 | 401 |
| 1936 | 68,363 | 3,020 | 713 | 1,778 | 529 | 534 | 381 | 468 | 390 |
| 1937 | 73,803 | 3,258 | 782 | 1,928 | 548 | 573 | 421 | 508 | 409 |
| 1938 | 68,433 | 3,046 | 704 | 1,809 | 533 | 527 | 382 | 478 | 402 |
| 1939 | 72,753 | 3,129 | 694 | 1,914 | 521 | 556 | 380 | 506 | 395 |

The average annual personal income in the United States for the base period was 108 per cent of the average for the years 1929–1939. The average annual personal income for the three States of Kansas,

Missouri, and Nebraska for the base period was 104 per cent of the average for the years 1929–1939, the per State average being: Kansas, 103 per cent; Missouri, 106 per cent; and Nebraska, 100 per cent. The average annual income per capita for the United States during the base period was 105 per cent of the average for the years 1929–1939. The average annual income per capita for the three States during the base period was 103 per cent of the average for the years 1929–1939, the per State average being: Kansas, 104 per cent; Missouri, 104 per cent; and Nebraska, 101 per cent.

Cash farm income from marketings of crops and livestock and Government payments, including all cash agricultural payments, such as rentals, price supports, and conservation payments for the United States as a whole, and for the States of Kansas, Missouri, and Nebraska, for the years 1924 to 1939, inclusive, was as follows:

CASH RECEIPTS FROM FARM MARKETINGS AND GOVERNMENT PAYMENTS FOR THE UNITED STATES AND FOR KANSAS, MISSOURI, AND NEBRASKA, 1924–1939

| Year | United States | Total three States | Kansas | Missouri | Nebraska |
|---|---|---|---|---|---|
| | ($1,000) | ($1,000) | ($1,000) | ($1,000) | ($1,000) |
| 1924 | 10,220,475 | 1,210,914 | 436,513 | 353,314 | 421,087 |
| 1925 | 10,995,902 | 1,295,825 | 465,120 | 385,838 | 444,867 |
| 1926 | 10,563,532 | 1,293,146 | 473,774 | 385,128 | 434,244 |
| 1927 | 10,755,525 | 1,232,907 | 449,889 | 364,654 | 418,364 |
| 1928 | 11,071,991 | 1,379,734 | 510,788 | 384,328 | 484,618 |
| 1929 | 11,302,889 | 1,404,487 | 523,643 | 391,742 | 489,102 |
| 1930 | 9,024,616 | 1,108,579 | 389,794 | 310,393 | 408,392 |
| 1931 | 6,372,680 | 755,676 | 260,119 | 216,415 | 279,142 |
| 1932 | 4,746,815 | 513,818 | 179,212 | 167,937 | 166,669 |
| 1933 | 5,445,501 | 568,906 | 189,872 | 184,670 | 194,364 |
| 1934 | 6,779,862 | 719,061 | 256,480 | 211,909 | 250,672 |
| 1935 | 7,659,367 | 777,001 | 281,804 | 252,674 | 242,523 |
| 1936 | 8,654,137 | 875,893 | 307,210 | 270,370 | 298,313 |
| 1937 | 9,217,051 | 866,953 | 325,255 | 273,447 | 268,251 |
| 1938 | 8,168,207 | 717,658 | 247,715 | 254,051 | 215,892 |
| 1939 | 8,684,675 | 807,359 | 276,323 | 281,464 | 249,572 |

The average annual cash receipts from farm marketings and Government payments for the United States in the base period were 99 per cent of the annual average for the years 1924–1939. The average annual cash receipts from farm marketings and Government payments for the three States of Kansas, Missouri, and Nebraska in the base period were 84.2 per cent of the annual average for the years 1924–1939, the per State average being: Kansas, 83 per cent; Missouri, 90 per cent; and Nebraska, 78 per cent.

In relation to the 1924 to 1929 averages the percentage of land value over the period 1930 to 1939, and the number of forced sales and related defaults on purchases of farms per thousand farms in the United States as a whole, and the States of Missouri, Kansas, and Nebraska, were as follows:

| Year | Land values | | | | Forced sales and related defaults | | | |
|------|------|------|------|------|------|------|------|------|
| | United States | Nebraska | Kansas | Missouri | United States | Nebraska | Kansas | Missouri |
| 1930 | 94 | 93 | 99 | 89 | 20.8 | 17.0 | 17.4 | 30.0 |
| 1931 | 87 | 88 | 90 | 76 | 26.1 | 24.4 | 23.4 | 27.9 |
| 1932 | 73 | 74 | 78 | 65 | 41.7 | 39.0 | 43.1 | 50.1 |
| 1933 | 60 | 57 | 61 | 53 | 54.1 | 63.9 | 61.1 | 59.8 |
| 1934 | 62 | 60 | 63 | 55 | 39.1 | 51.0 | 55.6 | 41.6 |
| 1935 | 65 | 60 | 64 | 56 | 28.3 | 45.0 | 48.0 | 35.8 |
| 1936 | 67 | 60 | 66 | 58 | 26.2 | 44.4 | 38.2 | 35.9 |
| 1937 | 70 | 60 | 68 | 58 | 22.4 | 42.4 | 29.0 | 31.9 |
| 1938 | 70 | 57 | 68 | 58 | 17.4 | 38.9 | 25.2 | 27.0 |
| 1939 | 69 | 54 | 67 | 56 | 16.8 | 39.9 | 25.7 | 25.3 |

The population of Missouri increased from approximately 3,629,000 persons in 1930 to approximately 3,785,000 in 1940. About 51 per cent of the 1930 and 1940 population was urban.

The population of Kansas decreased from approximately 1,881,000 persons in 1930 to approximately 1,801,000 in 1940. About 40 per cent of the 1930 and the 1940 population was urban.

The population of Nebraska decreased from approximately 1,378,000 persons in 1930 to approximately 1,316,000 in 1940. About 35 per cent of the 1930 and the 1940 population was urban.

The populations of Kansas City, Missouri, and Kansas City, Kansas, census years 1920, 1930, and 1940, were as follows:

| | 1920 | 1930 | 1940 |
|------|------|------|------|
| Kansas City, Missouri | 324,410 | 399,746 | 399,178 |
| Kansas City, Kansas | 101,177 | 121,857 | 121,458 |

The value of total construction contracts awarded, residential construction contracts awarded, and all other construction contracts awarded in the Tenth Federal Reserve District for the years 1923 to 1939, inclusive, is as follows:

VALUE OF CONSTRUCTION CONTRACTS AWARDED IN TENTH FEDERAL RESERVE DISTRICT, 1923–1939

| Year | Total construction | Residential construction | All other construction |
|------|------|------|------|
| | ($1,000) | ($1,000) | ($1,000) |
| 1923 | 127,981 | 30,694 | 97,237 |
| 1924 | 113,581 | 30,685 | 82,896 |
| 1925 | 150,737 | 48,517 | 102,220 |
| 1926 | 197,378 | 53,338 | 144,040 |
| 1927 | 212,369 | 64,392 | 147,977 |
| 1928 | 247,924 | 89,574 | 158,350 |
| 1929 | 226,116 | 71,234 | 154,882 |
| 1930 | 261,522 | 42,238 | 219,284 |
| 1931 | 137,370 | 20,975 | 116,395 |
| 1932 | 73,070 | 7,789 | 65,281 |
| 1933 | 64,313 | 10,380 | 53,933 |
| 1934 | 70,622 | 9,085 | 61,537 |
| 1935 | 89,751 | 16,569 | 73,182 |
| 1936 | 114,127 | 25,746 | 88,381 |
| 1937 | 123,272 | 30,557 | 92,715 |
| 1938 | 136,449 | 30,944 | 105,505 |
| 1939 | 126,522 | 36,362 | 90,160 |

The average annual value of total construction contracts awarded in the Tenth Federal Reserve District for the years 1936–1939 was 86 per cent of the average for the years 1923–1939 for total construction; 84.86 per cent for residential construction; and 86.37 per cent for all other construction.

Petitioner's sales, gross profit, other income, expenses, and net profit (or loss) for the years 1922 to 1939, inclusive, were as follows:

| Year | Sales | Gross profit | Other income | Expenses [1] | Net profit (or loss) |
|------|-------|--------------|--------------|--------------|----------------------|
| 1922 | $87,000.50 | $1,000.50 | | $30,595.00 | ($29,594.50) |
| 1923 | 268,720.10 | 89,505.83 | | 85,902.94 | 3,602.89 |
| 1924 | 157,342.90 | 39,851.78 | | 45,863.29 | (6,011.51) |
| 1925 | 177,497.80 | 46,831.90 | | 40,485.47 | 6,346.43 |
| 1926 | 304,361.52 | 53,956.36 | | 45,661.89 | 8,294.47 |
| 1927 | 284,473.59 | 59,567.63 | | 57,596.49 | 1,971.14 |
| 1928 | 223,086.85 | 50,527.11 | $703.53 | 47,245.67 | 3,984.97 |
| 1929 | 299,101.20 | 47,250.57 | 2,913.85 | 49,184.64 | 979.78 |
| 1930 | 161,116.37 | 35,581.47 | | 35,013.61 | 567.86 |
| 1931 | 106,100.05 | 19,539.97 | | 25,918.62 | (6,378.65) |
| 1932 | 82,851.55 | 9,508.15 | | 16,045.72 | (6,537.57) |
| 1933 | 55,375.42 | 18,015.66 | | 19,313.17 | (1,297.51) |
| 1934 | 56,549.65 | 9,819.10 | | 17,328.61 | (7,509.51) |
| 1935 | 56,151.38 | 13,664.32 | | 15,332.74 | (1,668.42) |
| 1936 | 101,284.51 | 22,254.29 | | 21,903.61 | 350.68 |
| 1937 | 191,978.49 | 46,392.11 | | 43,968.23 | 2,423.88 |
| 1938 | 129,930.75 | 32,192.35 | 166.05 | 32,632.88 | (274.48) |
| 1939 | 179,041.62 | 41,768.44 | | 36,993.63 | 4,774.81 |

[1] The expenses shown above include the salaries of the officers which varied from a high of $13,787.50 in 1937 to a low of $2,400 in 1933 and 1935. The salaries ranged from $5,700 to $13,787.50 during the base period.

Petitioner's average annual sales, gross profits, and net profits (or losses) for the period 1922 to 1939, were $162,331.35, $29,401.53, and a loss of ($1,443.66), respectively.

Petitioner's average annual sales, gross profits, and net profits for the base period 1936 to 1939 were $150,558.84, $35,651.79, and $1,818.72, respectively.

Petitioner's most profitable year during the 1922–1939 period was 1926 when it had profits of $8,294.47.

The average annual computed net profit of all corporations in construction for the base period was 92.3 per cent of the average for the 1922–1939 period. The 1939 compiled net profit of all corporations in construction is $46,087,000, which is 127.6 per cent of the base period average of $36,099,000.

The annual average nonresidential building construction for the base period was 86.30 per cent of the average for the 1922–1939 period. This does not include repair and maintenance costs which, in the base period years, were 120 per cent of the long-term average for non-residential building construction.

Bank debits to deposit accounts for the United States for the base period were 80 per cent of the average for the 1922–1939 period while bank debits to deposit accounts for the Kansas City area were up to 95 per cent of the average for the 1922–1939 period.

Postal receipts in Kansas City, Missouri, for the base period were 93 per cent of the average of the period 1925–1939.

Bank deposits in Kansas City, Missouri, and Kansas City, Kansas, for the base period were 130 per cent of the average of the period 1925–1939.

Kilowatt-hours generated by Kansas City Light & Power during the base period years were 121 per cent of the average of the period 1925–1939.

Grain receipts for Kansas City, Missouri, and Kansas City, Kansas, for the base period were 94 per cent of the average of the 1922–1939 period.

Department store sales in the Kansas City area during the base period years were substantially 100 per cent of the 1922–1939 average.

Average annual building construction in the Kansas City area for the base period years was approximately 78.8 per cent of the average of the 1922–1939 period.

Petitioner's excess profits net income for 1940–1945, inclusive, and its excess profits credits computed under the invested capital method were as follows:

| Year | Excess profits net income | Excess profits credits |
|------|--------------------------:|-----------------------:|
| 1940 | $5,247.29 | $10,375.91 |
| 1941 | 34,520.34· | 10,465.85 |
| 1942 | 74,806.93 | 10,323.66 |
| 1943 | 2,987.85 | 10,306.94 |
| 1944 | 30,414.66 | 10,301.22 |
| 1945 | 21,978.30 | 10,391.08 |

Petitioner's excess profits net income for the base period years, 1936 to 1939, inclusive, and the average thereof, was as follows:

| | |
|---|---:|
| 1936 | $350.68 |
| 1937 | 2,423.88 |
| 1938 | (274.48) |
| 1939 | 4,774.81 |
| Total | 7,274.89 |
| Average | 1,818.72 |

Petitioner timely filed application for relief under section 722 for each of the years 1941, 1942, 1944, and 1945, and related claims for refund (Form 843) for 1942, 1944, and 1945, based on claimed excess profits credits computed under the provisions of section 722.

A fair and just amount representing normal earnings to be used by petitioner as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period is less than the excess profits credit allowed to petitioner based upon invested

capital for each of the years in question, and the tax computed on the basis of the credit allowed is not excessive or discriminatory.

OPINION.

Although petitioner, in its claims for relief, asserted that it is qualified under all paragraphs of section 722 (b) of the 1939 Code, it is clear that its substantial reliance for qualification is based upon the effect of drought and insect infestation under section 722 (b) (1) or 722 (b) (2) and the effect of a profits cycle differing materially in length and amplitude from the general business cycle under section 722 (b) (3) (A). We assume, *arguendo*, that it has qualified upon those bases. There is no evidence of qualification under any other provision of section 722 (b), but, assuming that there may be some basis for qualification other than those specifically mentioned above, our conclusion would not be affected thereby.

We have elaborated on the facts in our findings, and we think that it would serve no useful purpose to analyze them in detail in our Opinion, because we think it is obvious that no realistic reconstruction of base period income would result in a constructive average base period net income even approaching the invested capital credit allowed petitioner under section 714, which credit ranged from $10,301.22 to $10,465.85 for the excess profits years involved.

Petitioner's long-term average "income" for the period 1922 to 1939, inclusive, was an average loss of $1,443.66. Its invested capital credit was more than five times its actual average base period net income of $1,818.72. Its most profitable year for the 1922–1939 period was 1926, in which its net income was $8,294.47, which is approximately 80 per cent of its lowest invested capital credit. In only 1 other year (1925) during the 1922–1939 period was its net income in excess of 50 per cent of its lowest invested capital credit. Its average net income for its 4 most profitable consecutive years (1925–1928) during said period was only $5,149.20, or approximately 50 per cent of its lowest invested capital credit. Its average net income for the 4 years during the 1922–1939 period having the largest volume of sales (1923, 1926, 1927, 1929) was only $3,712.07, approximately 36 per cent of its lowest invested capital credit.

Petitioner's highest ratio of net profit to sales in any 1 year (1925) was approximately 3.6 per cent. At this rate, it would require sales of approximately $286,145 to produce a net profit approximately equal to the lowest invested capital credit. Sales for the years 1923, 1926, 1927, and 1929 (the highest sales in any years of the 1922–1939 period) were in the respective amounts of $268,720.10, $304,361.52, $284,773.59, and $299,101.20. Even if we were to accept the average sales of these 4 years ($289,239.10) as typical of the base period, and apply 3.6 per cent, the highest experience ratio of petitioner's net profits to sales

in any 1 year, the resultant reconstructed net income of $10,412.61 would not entitle petitioner to even nominal relief because the reduction of the average earnings credit to 95 per cent of such reconstructed net income would result in a credit of less than the lowest invested capital credit.  For all other years of the 1922–1939 period, sales were substantially lower than the sales of the 4 years above discussed, being less than $100,000 in each of 5 years and less than $200,000 in each of 8 years.

After giving careful consideration to possible adjustment for the factors claimed as a basis for reconstruction, and also to reconstruction in the light of the overall facts presented, we are convinced, upon the whole record, that we are not justified in determining a constructive average base period net income which would produce a credit in excess of the lowest invested capital credit allowed to petitioner.  We therefore find that petitioner is not entitled to relief under section 722. *Farmers Creamery Co. of Fredericksburg, Va.*, 18 T. C. 241, 255–256 (1952) ; *Godfrey Food Co.*, 18 T. C. 1083, 1090 (1952).

For completeness, we add that we have carefully reviewed the testimony of the expert witness produced by petitioner, who expressed the opinion that petitioner is entitled to a constructive average base period net income of $20,000 to $30,000.  We find that his opinion is entirely unacceptable either as justifying the CABPNI which he suggests, or any lesser amount which would be sufficient to afford relief to petitioner.  The witness offered no worthwhile explanation, reasoning or analysis in support of his opinion, and his testimony consisted of the vaguest of generalities.  We need merely add that, on the basis of our discussion, *supra*, the evidence in the record, including data and statistics, which we have largely summarized or incorporated by reference in our findings, and which is substantially undisputed, necessitates a conclusion clearly contrary to that of the expert witness.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*